## HERCULES POWDER CO. v. ROHM & HAAS CO.

### Civ. A. No. 301.

District Court, D. Delaware.

July 9, 1946.

See, also, 4 F.R.D. 452.

Robert H. Richards, Jr. (of Richards, Layton & Finger), of Wilmington, Del., Theodore S. Kenyon and Edgar F. Baumgartner (of Kenyon & Kenyon), both of New York City, for plaintiff.

William S. Potter (of Southerland, Berl & Potter) and Arthur G. Connolly, both of Wilmington, Del., and John F. Bergin and T. Wallace Quinn, both of Philadelphia, Pa., for defendant.

LEAHY, District Judge.

This is a declaratory judgment action. Defendant, charging plaintiff's insecticide, "Thanite", infringes claims 1, 2, 3 and 7 of defendant's Heckert patent No. 1,808,-893,[1] manufactures and sells a number of compounds containing aliphatic thiocyanates under the name "Lethane". "Lethane" is a mark registered as No. 251,904. Plaintiff seeks a declaration that the Heckert patent is invalid and not infringed. In addition, plaintiff charges defendant with unfair competition and violation of the antitrust laws by misuse of patent by attempted restraint of interstate commerce. Defendant denies all such allegations and insists on infringement of Heckert and infringement of defendant's mark "Lethane" by plaintiff's use of its trade name "Thanite".[2]

### 1. Validity Presumptive.

After review of the record but before I actually made findings, I was prepared to hold the patent in suit valid, subject to further analysis of a case recently decided by the Circuit Court for this circuit.[3] Just recently, another case from this circuit was decided.[4] These two cases, which will be discussed later, compel the conclusion that the Heckert patent must be held invalid.

The argument in support of validity is that the Heckert patent was based upon discovery that aliphatic thiocyanates containing one or more negative elements or groups in the organic residue possess the insecticidal properties characteristic of thiocyanates and are devoid of offensive and persistent odor and irritant properties which are stated in the patent to render other thiocyanates unsuitable for use as household insecticides.[5]

Heckert's patent is a division of his parent patent No. 2,024,098, filed May 31, 1929. The parent patent relates to the effect of the so-called negative groups on the insecticidal activity of thiocyanates, and also relates to the effect of the same negative groups on the odor and irritation of aliphatic thiocyanates. Heckert describes and claims a class of synthetic contact insecticides which have been able to compete with pyrethrum insecticides. It is a pioneer patent which has been of great assistance to the industry. For years prior to the invention, many of the investigators attempted to discover a satisfactory substitute for pyrethrum, but without success.

---

[1] Issued June 9, 1931.

[2] In accordance with the recommendation of the Advisory Committee on Rules for Civil Procedure as to the proposed amendment to Rule 52, 28 U.S.C.A. following section 723c, the findings of fact and conclusions of law will be incorporated into this memorandum. The findings and conclusions will be divided into five parts relating respectively to (1) validity of patent, (2) infringement, (3) unfair competition, (4) violation of the antitrust laws by misuse of patent, and (5) trade mark infringement.

[3] Standard Oil Company of California v. Tidewater Associated Oil Company, 3 Cir., 154 F.2d 579.

[4] Minnesota Mining & Mfg. Co. et al. v. Carborundum Company et al., 3 Cir., 155 F.2d 746.

[5] The insecticides in suit are mainly directed at the musca domestica. Within ten weeks the house fly lays about five batches of eggs, 100 eggs in a batch. Within three weeks, hatching takes place and each new female deposits hundreds of eggs. Calculations show that between April and September, if all hatched flies live, the progeny of a single female fly would be approximately 6,000,000,000,000.

The invention in suit has attained commercial success; and it is one that has freed the American insecticide manufacturers from the domination of foreign pyrethrum growers, mainly and until recently Japan. It has helped to start a new industry, i.e., the manufacturing of synthetic contact insecticides. Heckert commenced his work by careful study during the summer of 1928 on the work of synthetic insecticides. After preparing and testing a number of other compounds and knowing from examination of the literature that thiocyanates had insecticidal properties, he prepared and tested benzyl thiocyanate, an aromatic compound, and found that it had striking insecticidal properties but that its odor and irritant action completely precluded any possibility of using it as a household spray. Between March and August, 1929, he prepared and tested a number of thiocyanates; and he selected an aromatic thiocyanate which he designated as H-145. Attempts were made to commercialize this product. A number of aliphatic thiocyanates were made and tested during this period—some without negative elements, some with ester groups, some with another thiocyanate group, including ethylene dithiocyanate, and one with an ether group. It was determined that all these were inferior to the aromatic compound H-145. Heckert, on August 16, 1929, read Wesche French patent No. 654,-416, which described one aliphatic thiocyanate, ethylene dithiocyanate. It does not contain a negative group in the organic residue, as appears in the patent in suit. Ethylene dithiocyanate is not used commercially as an insecticide since it is extremely irritating. But by the introduction of a negative group in the organic residue of ethylene dithiocyanate, successful insecticides have been produced.

After August, 1929, Heckert's work on thiocyanates was discontinued for a time and he addressed himself to other types of compounds. Thereafter, he resumed his study of thiocyanates and in March, 1930, prepared and tested a compound having an ether group which he designated as H-384. This compound was an improvement over H-145. Heckert carried on his research program in an orderly scientific manner, and the conclusions which he derived therefrom are supported by the evidence. There were experiments which might indicate a contrary conclusion. This was to be expected, since experimental error is present in every scientific investigation.

The invention in suit is not described, nor is it implied from the prior art. Claims 1, 2, 3 and 7 cover a number of insecticides. Claim 2 is limited to insecticides wherein the named thiocyanates are dissolved in a petroleum distillate, for example kerosene. Many of the named thiocyanates can not be dissolved in such a distillate, and hence, are excluded from this claim. Prior art makes no description or suggestion that the thiocyanates referred to in this claim may be dissolved in kerosene or any other petroleum distillate. Claim 3 is directed to insecticides wherein the named thiocyanates contain an ester linkage. Claim 7 is directed to insecticides wherein the named thiocyanates are mono-thiocyanates. No prior art insecticide contains these factors.[6]

The inter partes tests were the subject of much controversy at the trial of the cause. These tests were had to determine the toxicity of the thiocyanates mentioned by Heckert and others in addition and how high the various compounds were in "knock down" and "kill" of the ordinary house fly. Defendant criticizes the absence of scien-

---

[6] Research carried on by defendant between 1930 and 1938 in order to make its insecticides free of all odor and irritation and the work done by defendant's Dr. Hester, which resulted in the issuance of the Hester patent No. 2,220,521, are irrelevant matters, for Heckert's invention must be tested as of 1931, not 1938. In order to test the validity of a patent its contribution to the art must be tested as of the day of its birth, not a decade later, or long after the art has advanced. Standing here, in 1946, we are required to look back at Heckert working in 1929–30. Practically everything we take for granted today at one time was a problem, in many cases a problem that was thought to be insoluble. In short, in determining the validity of Heckert's patent, we can not play the role of a Monday morning quarterback.

tific manner in conducting the inter partes test program and complains that the inter partes tests should be considered irrelevant because the thiocyanates compared were not produced by comparable processes. In connection with these tests, it appears that if defendant was dissatisfied with the way the tests were being conducted, no remonstration was made by the defendant's observers, who were present at the time of the tests, as to the techniques used. I gave little weight to the inter partes tests because, at best, the accent was not properly placed. The tests for determination of odor and irritation were not made on a sufficiently large number of people and under such conditions that the "personal element", which is always present in determinations of odor and irritation, could be minimized. The tests were conducted by trained technicians whose natural habitat is the laboratory. No housewife who uses an insect spray was called to testify whether in her opinion either one or the other of the various compounds had more or less odor and irritant qualities.

After considering all of what has so far been discussed, I was ready to reject the plaintiff's argument that the Heckert patent should be limited to one example and to the one claim that covers that example, namely, claim 6. Finally, I was ready to accept the proposition, that Heckert did not claim to be the discoverer of all organic thiocyanates which are insecticidally active; but that his invention was concerned with insecticides containing a restricted class of organic thiocyanates which could replace pyrethrum in the household. At this point in my considerations I would have held claims 1, 2, 3 and 7 of the patent in suit valid, but for the two recent cases, a reference to which will follow.

## 2. Invalidity.

■ The recent case of Minnesota Mining & Manufacturing Co. et al. v. Carborundum Company et al., 3 Cir., 155 F.2d 746, 750, teaches that the inventor, when he comes to write his patent, can not describe his invention in general terms which would include many other chemical substances, some of which would carry out

the rule of the patent, but many of which could not be thus employed; that is, the inventor can not disclose a small number of compounds which will serve as a springboard for claiming an entire class. While it was no part of the decision in the case, the opinion contains specific and strong dicta that where an inventor deals, for example, in aliphatic organic compounds, he can not claim substituted aliphatic organic compounds without naming them. The ratio behind the decision is that a generalized formula may not contain hundreds of thousands of inoperative compounds, and the patent must not leave it to be determined by experiment which compounds will be operative within the teachings of the patent. As stated by Judge Biggs, "This becomes clear when one realizes that to determine which compounds * * * would be useful * * * would require even a person skilled in the art to embark on many experiments in a comparatively little known field of organic chemistry."

The second of the cases from this circuit which has pertinency is Standard Oil Company of California v. Tidewater Associated Oil Company, 3 Cir., 154 F.2d 579, 582. After discussing the statutory requirement of particularity and distinctness which must be had under R.S. § 4888, 35 U.S.C.A. § 33, and the public policy behind the interpretation of that statute as expressed by the Supreme Court, Judge Goodrich said: "The most immediate test of sufficiency of precision in description following from the policy just outlined is that no inventor may compel independent experimentation by others to ascertain the bounds of his claims." In short, this case, in turn, teaches that no inventor shall be permitted to say, "My patent is not to be limited in its application to the conditions set out in the data appearing in the patent."

■ No critical observation can be made of the rule for the application of R.S. § 4888 as recently announced by this circuit in the two cases mentioned, supra. My original view to sustain validity of the Heckert patent was based upon a broader interpretation of the statute. I thought that if Heckert could fairly be said to be one of the pioneers in attempting to uti-

lize a class of organic thiocyanates insecticidally active which would be free from odor and irritation, he was entitled to such an interpretation. But, applying the rule of construction of R.S. § 4888 as found in the Minnesota Mining & Manufacturing Co. and Standard Oil cases to the facts of the case at bar, then it follows that plaintiff has established a record sufficient to condemn the Heckert patent. Accordingly, the special findings which form the base for this conclusion follow:

1. The Heckert patent is based upon an avowed discovery that aliphatic thiocyanates containing one or more negative groups in the organic residue possess insecticidal properties characteristic of thiocyanates, but are devoid of odor and irritation and are thus suitable for use as household insecticides. In his specification, Heckert states, "This invention relates to insecticides and is based upon the discovery that certain aliphatic thiocyanates, notably those containing one or more negative elements or groups in the organic radical, possess the unusual insecticidal properties characteristic of thiocyanates but are devoid of certain undesirable properties of other thiocyanates, e.g., offensive and persistent odor and irritant properties."

2. The claims in suit follow:

(1) An insecticide comprising an aliphatic thiocyanate, the organic residue of which comprises a negative group.

(2) An insecticide comprising an aliphatic thiocyanate, the organic residue of which comprises a negative group, dissolved in a petroleum distillate such as kerosene.

(3) An insecticide comprising an aliphatic thiocyanate, the organic residue of which comprises an ester linkage.

(7) An insecticide comprising an aliphatic mono-thiocyanate, the organic residue of which comprises a negative group.

3. The term "aliphatic thiocyanate", appearing in the specification and claims, is understood to be an organic compound containing a thiocyanate radical and in which the carbon atoms are in open chains, which may be straight or branched, but are not closed to form a ring or rings.

4. The term "organic residue", appearing in the patent, is understood to mean the entire molecule except for the thiocyanate radical.

5. The term "negative group" means any modification of the organic residue; and the term includes carbonyl groups, unsaturated groups, halogens, other thiocyanate groups, hydroxyl groups, ether linkages, cyanide groups, acid radicals, alkoxy or ether groups and oxygen, sulphur, iodine and other negative groups.

6. The specification avers that the patent is not limited to the specific compounds named. The number of aliphatic thiocyanates covered by the claims is unknown. Considering the aliphatic thiocyanates which contain 20 carbon atoms or less, there are 100,000,000 of such thiocyanates theoretically possible.

7. There are many aliphatic thiocyanates, the organic residues of which contain various negative groups which have offensive and persistent odor and irritant properties.

8. In order to determine which thiocyanate compounds, as defined by Heckert, are free from odor and irritation, it is necessary for a person skilled in the art to make many experiments.

The conclusion under this branch of the discussion is that claims 1, 2, 3 and 7 of Heckert's patent No. 1,808,893 are invalid.

### 3. Non-infringement.

If error has been committed in that I have incorrectly applied the law of this circuit on the requirements of R.S. § 4888, and the Heckert patent is valid, then I think it appropriate and for the benefit of the parties to make findings on plaintiff's alleged infringement.

9. The claims in suit, if valid, are limited to aliphatic thiocyanates, as those compounds are defined in finding No. 3. Cyclic thiocyanates have a closed ring of carbon atoms. Cyclic compounds with a ring of six carbon atoms, the alternate carbons of which are joined by double bonds, are classified as aromatic. Other cyclic compounds in which the rings are composed entirely of carbon atoms are classified as alicyclic. The compounds contained in plaintiff's ac-

904

cused Thanite are not aliphatic thiocyanates because each contains a terpene radical comprising carbon atoms arranged in the form of a double ring. Beilstein's Handbuch der Organischen Chemie contains a system of classification of compounds which distinguishes between aliphatic compounds, as defined above, and the cyclic compounds in which the carbon atoms are arranged in rings. Accordingly, defendant's statement that plaintiff's thiocyanates are aliphatic thiocyanates finds no basis in the Beilstein system of classification. Defendant's contention that plaintiff's thiocyanates are, nevertheless, aliphatic thiocyanates implies a separation between the cyclic terpene radical and the aliphatic side chain radical of plaintiff's thiocyanates. But, it would appear such radicals are incapable of independent existence because the compounds assume their properties from all their parts and can not be classified except as a whole. The claims in suit are for aliphatic compounds and can not be construed to cover an aliphatic radical apart from the compound as a whole; in such compounds the radical can not exist alone.

10. A construction of the claims in suit to include Thanite is prevented by other thiocyanates, found in the prior art, which contain a cyclic radical and an aliphatic side chain to which the thiocyanate group is attached. There is no disclosure in the patent in suit of a thiocyanate of the terpene class to which the accused product, Thanite, belongs. Plaintiff gets no benefit in respect of odor, irritation, or insecticidal properties from the inclusion of the negative group in the organic residue of Thanite; it uses that form of compound because of the greater availability of materials and ease of manufacturing procedure.

*Comment.*

■ Even if Heckert in his specification speaks of an alicyclic as an aliphatic thiocyanate, it is in his claims that one must find the limits of his invention. Keystone Bridge Co. v. Phoenix Iron Co., 95 U.S. 274, 24 L.Ed. 344; McClain v. Ortmayer, 141 U.S. 419, 12 S.Ct. 76, 35 L.Ed. 800. If the claims speak of aliphatic

thiocyanates, the question is whether plaintiff's "Thanite" is an aliphatic thiocyanate. There is no dispute as to what "aliphatic" means. Both parties agree that it refers to organic compounds in which the carbon atoms are arranged in open chains; "the chains may be straight or they may be branched, but they may not be closed to form a ring or rings." Beilstein's classification puts organic compounds into groups: (a) aliphatic; (b) carbocyclic; and (c) heterocyclic. (b) is subdivided into aromatic and alicyclic compounds, the first containing the aromatic ring formed of six carbon atoms with double bonds between the alternate carbons and the second including all others in which the ring is composed solely of carbon atoms. According to the Beilstein classification, Thanite is an alicyclic compound. But defendant challenges Beilstein's authority to make the classification and claims Thanite is, nevertheless, an aliphatic thiocyanate because it is a mixed compound in which the thiocyano group is attached to an aliphatic side chain of the molecule. Thiocyanate's components, for example, says defendant, have the formula

$$\overset{O}{\overset{\|}{R-O-C-CH_2-SCN}}$$

wherein R, the parties agree, represents certain terpene radicals and are alicyclic radicals. It is agreed, too, that the

$$\overset{O}{\overset{\|}{-O-C-CH_2-}}$$

radical to which the SCN group is attached is an aliphatic radical. But, after this, the parties split on approach. Plaintiff argues that the presence of the alicyclic terpene group makes the compounds alicyclic thiocyanates. Defendant argues the compounds are aliphatic thiocyanates because the thiocyanate group is attached to an aliphatic radical and the presence of the alicyclic terpene group on the other end of the molecule can not change the classification. Defendant contends that when called upon to name a compound, the chemist analyzes structure to find the parent hydrocarbon or the "stem nucleus".

Defendant illustrates, for example, the formula for isobornyl thiocyanoacetate, which shows:

Stem molei

(Camphane - Alicyclic) (Ethane - Aliphatic)

At best, all this is argument that the thiocyanate molecule of the accused product, Thanite, may in part be aliphatic and in part alicyclic.

 Heckert, himself, helps us to read his claim. In the first paragraph of his patent he says: "In my copending application Serial 367,626, filed May 31, 1929, I disclose a new insecticide comprising an organic thiocyanate, the organic residue of which contains a negative group. The instant application is in the nature of a divisional application *to cover specifically an aliphatic thiocyanate,* the organic residue of which contains a negative group, *the aromatic thiocyanates* being specifically claimed in application 367,626 mentioned above." (Emphasis added.) This declaration on the part of the inventor manifestly looks to a limitation to an aliphatic thiocyanate. Hence, I accept plaintiff's argument on the point under discussion, i. e., a radical can have no separate existence because a compound must be preserved in its totality. The claims here read on compounds, not radicals; they are based not on a theoretical existence or a speculative conception. As stated in the discussion under validity above, it is the law of this circuit that defendant may enjoy a monopoly of its Heckert patent only if it complies with the mandates of R.S. § 4888, which requires a "full, clear, concise,

and exact [description]" so that the process can be utilized by those skilled in the art. Heckert's claims—here silent on alicyclic, articulate on aliphatic thiocyanates—measure his invention because specificity of claim is required to protect the public against extension of the scope of a patent. See, too, Universal Oil Products Co. v. Globe Oil & Ref. Co., 322 U.S. 471, 64 S.Ct. 1110, 88 L.Ed. 1399; General Electric Co. v. Wabash Appliance Corporation, 304 U.S. 364, 368, 369, 371-373, 58 S.Ct. 899, 82 L. Ed. 1402; Walker on Patents, Deller's Ed., p. 770. Reference is always permissible to the specification in order that an invention may be found within the context of the patent; but references to specifications are only for the purpose of better understanding the meaning of the claim. A reference to a specification can not change the claim or make it different from what it is. White v. Dunbar, 119 U.S. 47, 7 S.Ct. 72, 30 L.Ed. 303; United States Glass Co. v. Atlas Glass Co., C.C., 88 F. 493, affirmed 3 Cir., 90 F. 724.

 It is concluded that plaintiff's sale of its compounds and the use thereof in the manufacture of insecticides, sold under the trade mark "Thanite" do not infringe claims 1, 2, 3 and 7 of Letters Patent No. 1,808,893.

### 4 and 5. Unfair Competition and Violation of Antitrust Laws.

10. There is no evidence to support the charge that defendant in the sale of its Lethane products has been guilty of unfair competition.

11. There is no evidence that defendant ever attempted to use the patent in suit to monopolize or control any product outside the scope of its claims; and all of defendant's insecticidal compounds have been sold to willing buyers without restrictions or licenses of any type.

*Comment.*

 Plaintiff's charge of unfair competition and antitrust violation is based on (a) defendant's refusal to license plaintiff under its patent, and (b) the argument that defendant's Lethane products are not

covered by the claims of the patent in suit. As late as Hartford-Empire Co. et al. v. United States, 323 U.S. 386, 65 S.Ct. 373, 89 L.Ed. 322, and Mercoid Corporation v. Mid-Continent Investment Co., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376, it has been recognized that a patentee has the power to refuse a license. It is difficult to detect in the record any evidence that the Lethane products are not covered by the claims of the patent in suit. The Lethanes are insecticide concentrates, i. e., they are insecticides. The evidence shows that this is the general understanding in the industry. There are no restrictions connected with the sale or resale of the Lethane products. Defendant utilizes a sales agreement which is uniform with respect to all of its products. In short, there is no evidence to support the charge of unfair competition or antitrust law violation.

Therefore, it is concluded defendant is not guilty of any unfair competition; and defendant has not misused the patent in suit, nor has it violated any of the antitrust laws by misuse of its patent.

### 6. Trade-Mark Infringement.

12. No similarity exists between plaintiff's mark "Thanite" and defendant's mark "Lethane" such as to confuse the trade. Defendant's mark "Lethane" is used in connection with the sale of insecticidal concentrates to approximately 1500 manufacturers of fly sprays; all deal directly with defendant; all are visited at least once a year by defendant's salesman. Defendant's customers know with whom they deal; there is no evidence that any customer has ever been confused by the two marks.

13. The plaintiff's mark "Thanite" is pronounced with a short "a" (as in the Greek word *Thanatos*, its derivative) ; defendant's mark "Lethane" is pronounced with a long "a" (as in the simple hydrocarbons methane, ethane, etc.)

14. The words are different in appearance and in pronunciation. The test of memory comparison negatives confusing similarity.

*Comment.*

■ It is difficult to find confusion between Thanite and Lethane. Without confusion or likelihood of confusion there can be no infringement. Defendant has a customer's list of approximately 1500 names and they are in contact with all of the industry. This is not a case involving the sale of commodities over the counter. The channels of trade for defendant's product are directed to those who have knowledge of defendant's firm. There is little likelihood that in making a purchase of Thanite the trade would believe that they were buying a product of defendant. A review of the evidence shows no proof of actual confusion or likelihood of confusion arising from the plaintiff's use of its trade mark "Thanite". It has been held that the use on similar goods of marks having identical letter sequences in positions corresponding to those of "than" in the marks "Thanite" and "Lethane", will not necessarily result in confusion.[7] It is concluded plaintiff has not infringed defendant's trade mark rights or its registered mark No. 251,904.

A form of decree should be submitted in accordance with the foregoing.

---

[7] Thus, "Hygle" was held not infringed by "Glo-ray", Graf Bros., Inc., v. Marks et al., D.C., 41 F.2d 167; "Wearever" not infringed by "Everlasting", Aluminum Cooking U. Co. v. National Aluminum Works, D.C., 226 F. 815; "Best Yette" not infringed by "Veribest", New York Mackintosh Co. v. Flam, D.C., 198 F. 571; and, conversely, "Enzo-Jell" was held registerable over "Jell-O", Postum Cereal Co. v. Enzo Jel Co., Cust. & Pat.App., 41 F.2d 101; "Safepack" over "Arksafe", Arkell Safety Bag Co. v. Safepack Mills, 53 App.D. C. 218, 289 F. 616; "Quikmix" over "Bisquick", General Mills, Inc., v. Commercial Milling Co., 28 USPQ 31; "Swandale" over "White Swan", Hiram Walker & Sons, Inc., v. Pacific Distillers, Inc., 42 USPQ 535.