WINKLER-KOCH ENGINEERING CO. v.
UNIVERSAL OIL PRODUCTS CO.
(DELAWARE) et al.

District Court, S. D. New York.

Oct. 11, 1946.

78

Paul Kolisch, of New York City (J. Bernhard Thiess, Thorley Von Holst, Sidney Neuman, Robert W. Poore, and Thiess, Olson & Mecklenburger, all of Chicago, Ill., of counsel), for plaintiff.

Dwight, Harris, Koegel & Caskey, of New York City (Ralph S. Harris, John R. McCullough, Frederick W. P. Lorenzen, and Caesar L. Pitassy, all of New York City, of counsel), for defendants Universal Oil Products Co. and Standard Oil Company (Indiana).

Cahill, Gordon, Zachry & Reindel, of New York City (John T. Cahill and Harold S. Glendening, both of New York City, Felix T. Smith, of San Francisco, Cal., and William L. Dennis, Robert M. Bozeman, and John M. Richardson, all of New York City, of counsel), for defendant Standard Oil Co. of California.

BRIGHT, District Judge.

This action is brought under section 4 of the Clayton Act, 38 Stat. 731, 15 U.S. C.A. § 15, to recover treble damages for an alleged violation of the Sherman Act. The defendants Universal Oil Products Company of Delaware, Standard Oil Company of California, and Standard Oil Company of Indiana, move for an order declaring that service of process upon each of them is a nullity, that this court is without jurisdiction over them, and that the venue in this district is improper, none of them being an inhabitant, or found, or transacting business here. Universal also contends that service of process upon it in this district was improper, because it is not an inhabitant of or found in this district.

Under section 12 of the Clayton Act, 15 U.S.C.A. § 22, a suit such as this may be brought in the judicial district where the corporation is an inhabitant, or where it may be found or transacts business; and process may be served in the district of which it is an inhabitant or wherever it may be found.

The questions to be decided are, whether, at the time of service of process, Universal was "found" in this district, and whether Standard of California and Standard of Indiana were then "transacting business" here.

None of these defendants is or was an inhabitant here. A corporation resides in and is an inhabitant of the state of its incorporation.

Universal Oil Products Company.

Universal is a Delaware corporation, has its principal place of business in Chicago, Illinois, and a small office in New York City. The summons and complaint were served upon Thomas W. Bowers, chairman of its board of directors, on March 29, 1945, at New York City.

Under section 12 of the Clayton Act above referred to, this corporation not being an inhabitant of this district, process could only be served upon it if at the time of service it was "found" here. If it were not "found" here, service of process here would not be within the statute even though the corporation is shown to have been "transacting business" in this district.

In the determination of whether or not Universal was "found" here, a consideration of the nature of its business at the time of service of the process (International Harvester v. Kentucky, 234 U.S. 579-585, 34 S.Ct. 944, 58 L.Ed. 1479) is important.

As shown by its briefs and other papers, it was engaged in conducting research and experimental work for the purpose of inventing and developing processes and practices for the refining of crude oil to make gasoline and other petroleum products, procuring patents covering such processes and practices and licensing the use thereof, whether patented or unpatented, furnishing engineering services to licensees, and selling catalysts and inhibitors used in certain refining processes. The licensing business consisted of granting licenses to refiners of petroleum products to use all or some of the patents and patented processes owned by Universal. None of its licensees maintained any refinery within the Southern District of New York. The servicing phase of the business consisted of supervising the design, construction and initial operation of licensees' refining units and in passing on to these licensees technical "know-how." The catalysts and inhibitors sold by Universal are manufactured for Universal by others at manufacturing plants located outside this district. It had approximately 250 employees in its research laboratory at Riverside, Illinois, and about 350 others who were employed in or worked out of its executive, engineering and sales offices in Chicago. The services of all of its employees, except a Mrs. Mix, were performed within the State of Illinois, with the exception of between 60 and 80 safety engineers, servicemen and salesmen, who, from time to time, traveled outside of Illinois for the purpose of negotiating licenses, supervising the installation and operation of apparatus and equipment to practice its processes, and servicing refining equipment in the event the same should become necessary. It has never licensed a single refinery or other manufacturing plant of any kind located within this district. Mrs. Mix was the only employee of Universal stationed in its New York office, and was there employed as receptionist, stenographer and telephone operator. That office has been maintained since September 21, 1944.

Prior to 1939, Universal maintained in New York an office in which there were stationed one Halle, the president of the corporation, Behrens, the secretary, a house lawyer, a sales engineer and six clerks. After 1939, the office force was reduced to Halle and a clerical staff consisting of his secretaries, a telephone operator, and a receptionist. In May 1944, following the death of the president, Mr. Halle, Universal vacated the large office and moved to the smaller office in which Mrs. Mix was the sole employee and which is maintained at an annual expense of over $7,000.

The affidavits and the testimony of Mrs. Mix reveal that her duties were to receive incoming calls and refer callers to the main office in Chicago, to receive mail and forward it to the proper officer or employee of Universal in Chicago, to receive callers and inform them that Universal's office is located in Chicago, and to obtain transportation and hotel reservations for those employees of Universal who had occasion to come to or pass through New York. In February, 1945, the assistant treasurer of Universal, in an application for residence telephone service for Mrs. Mix, described her duties as being primarily of an "administrative nature," and that she was responsible for correspondence and inquiries received from licensees, the major oil companies and various governmental agencies pertaining to Universal's activities; its traveling engineers kept in constant communication with her, so that their whereabouts might at all times be determined. For her services, Mrs. Mix received a salary of $200. per month, recently raised to $260. per month. The office diary of Mrs. Mix shows that the New York office was used by Universal employees for purposes of holding conferences and making telephone calls to, and receiving them from, the many persons in New York with whom they had business dealings. During the period from September, 1944 through October, 1945, there were made from the office, 268 long distance telephone calls, of this number 113 were personal calls of Mrs. Mix, 54 were calls to Universal's Chicago

office, the balance of the calls ranging from 200 to 700 per month were not explained.

At the time of the service of process, the Board of Directors of Universal consisted of Messrs. Thomas Bowers, Ralph S. Harris, Guy E. Reed, Kenneth H. Rockey and Joseph G. Alther, three of them residing or doing business in New York City. Each of these directors, with the exception of Alther, was elected by Guaranty Trust Company of New York, the holder of all the voting stock and other securities of Universal, at a meeting of stockholders held at the office of Guaranty Trust Company of New York, 140 Broadway, New York City, in December 1944. The first action taken by the Board of Directors was that of convening in December 1944 for the purpose of choosing Thomas W. Bowers, as their chairman at an annual salary of $10,000. From June 1, 1944 through the month of May 1945, the Board of Directors, in which the Certificate of Incorporation and By-Laws vested the management of the property, affairs and business of the corporation, held five meetings in New York. To each of these meetings, the treasurer of the corporation was required to travel from Chicago to have statements available for the board; for one of the meetings the comptroller, traveled to New York. Although not a director, Behrens, the corporation's secretary located at Chicago also attended the meetings. At these meetings, the Board approved, ratified and confirmed, the action of the officers in executing a number of license agreements in the name of the corporation, the action of the officers of the corporation in executing agreements providing for the rendition by Universal of engineering services to various companies, as well as for the exchange of patent rights and technical information, and the action of officers of the corporation in committing Universal to a reduction of royalties. At one of the meetings, the Board of Directors approved new forms of licenses and other agreements to be used by the company in the conduct of its patent licensing business. At others, it heard reports on, and considered, the litigation in which the company was involved, and the various claims which were being preferred by and against the company; and in several instances the Board approved, ratified and confirmed the action of the officers of the corporation in settling certain claims and in disposing of litigation brought by the company. The Board also considered and took action upon reports of the accounting and auditing firms retained by the corporation regarding fiscal affairs and accounting policies, as well as budgets and financial statements prepared by such accounting firms and by the employees of the corporation. The corporate minute books were kept in New York until some time after the service of process on Universal.

Under section 20 of the by-laws of Universal, Mr. Bowers, as chairman of the Board of Directors, shall have general supervision of the business of the corporation and over its several officers, subject however, to the control of the Board of Directors; he shall preside at all meetings of the Board of Directors and stockholders and shall perform such other duties as may from time to time be assigned to him by the Board of Directors. Following his election as chairman, Bowers was in constant communication with Mrs. Mix, also met with Behrens several times in New York and discussed with him the background and past history of the company in connection with certain legal matters which he was conducting for it. It does not appear that Bowers ever executed any contract on behalf of Universal. On several occasions he had meetings with persons other than employees or directors of Universal on matters affecting the affairs of Universal. On one occasion, accompanied by Behrens, he called on R. J. Dearborn of the Texas Company and on another, also accompanied by Behrens, he called on Carlisle of the Standard Oil Company of New Jersey. The purpose of the calls was to clear up the complexities of some legal matters which Bowers was handling for Universal. At these meetings there did not appear to be any discussion of other matters between Universal and either the Texas Company or the Standard Oil Company of New Jersey. He also met one Bruce Brown, a director of Standard Oil Company (Indiana), at the Universal office in New York and discussed with him matters involved in the present litigation. On another occasion he met with

a Mr. Grant of the Pennzoil Co., one of Universal's licensees. This meeting followed an exchange of correspondence between Bowers and Grant wherein the latter had attempted to get Universal interested in a "mining or oil" venture. At the meeting Bowers listened to a more detailed explanation of the venture, and reported the substance of the talk to his associates in Chicago.

As to conferences with employees of Universal, in January 1945, Bowers called at Universal's New York office and met one Wilson an employee of Universal who conducted Universal's negotiations with various licensees and prospective licensees. At a later date, he met with Behrens and others, including the representatives from the Chicago office of Arthur Andersen & Company who had prepared an audit of Universal's financial statements for the year 1944, and who were about to submit a report on that audit to the Board of Directors at a meeting to be held the following day.

During the period December 1, 1944, through October 11, 1945, employees of Universal met in New York with the representatives of the Trinidad Leaseholds, Ltd., one of Universal's royalty-paying licensees on the following occasions: On December 1, 1944, E. F. Nelson, then in charge of Universal's engineering and development, met with some of the staff of Trinidad for the purpose of holding "technical discussions." These discussions involved consideration of questions relating to increased aviation gasoline production at Trinidad's refinery located on the Island of Trinidad in the British West Indies. In the fall of 1944, Dr. Bloch, a research chemist of Universal's Riverside Laboratory, made two trips to New York to discuss with the members of Trinidad's technical staff the possibility of producing chemicals at the Trinidad refinery. Over a period of approximately eight days, Belden, another employee of Universal met with members of Trinidad's technical staff to discuss processes for the extraction of naphthenic acid from Trinidad's crude oil at its refinery in Trinidad. On March 6, 1945, Nelson revisited New York and joined Belden for further conference and discussions with the

technical staff of Trinidad. On June 8, 1945, Nelson and the president and vice-president of Universal met with one Blair, the head technical man of Trinidad. At this meeting, a project referred to as the "Trinidad Survey" was discussed. Subsequent to this meeting there appeared among defendant's records, accounting vouchers which referred to the "Trinidad Survey." Defendant, however, maintains that this survey was initiated in the late fall of 1944 or the early spring in 1945 by a letter from Beaumont, the managing director of Trinidad, written to Alther, the vice president of Universal, in Chicago. Late in the spring of 1945 Gerhold, a chemical engineer, and one Sutherland, both members of the development department of Universal, met with representatives of Trinidad and engaged in a technical discussion with respect to the proposed installation of a pentane isomerization unit in the Trinidad refinery. On June 18, 1945, G. A. Bochman, the assistant treasurer of Universal, had telephone conversations with one Foster of Trinidad and then called on Foster. On June 20, 1945, Gustav Egloff, one of the research chemists of Universal, had conversations with a Mr. Beaumont of Trinidad. On August 1 and 2 and again on October 10, and 11 of 1945, Newton, one of Universal's chemical engineers in the Surveys Department assigned temporarily to the carrying out of surveys at refineries, met with members of the technical staff of Trinidad.

On November 6 and 7, 1944, representatives of the technical staff of Universal had conferences in New York with representatives of the Asiatic Petroleum Company to review the proposed designs for a new plant to be erected by N. V. de Bataafsche Petroleum Maatschappy at Curacao, Venezuela. These discussions were based on flow charts and preliminary process specifications prepared by Universal. They also included a consideration of and agreement upon, changes to be made in the flow diagrams; in addition the conferees agreed that Universal would proceed with the detail flow diagrams on the cracking and reforming units, the design of various other matters being temporarily deferred pending arrival of a decision from the London office

of Bataafsche. Also, the location of various parts of the refinery equipment was agreed upon. During the conferences, Universal delivered to Asiatic, the drawings and preliminary process specifications which had been prepared by Universal. Thereafter, on February 20 and 21, 1945, L. C. Huff, a Universal engineer, assigned to follow the details of the Bataafsche job from the viewpoint of technical equipment and the relation of such equipment, conferred at New York, with representatives of Asiatic and Bataafsche regarding the design of the two cracking units, a reforming unit and a polymerization unit. On February 27, 1945, Universal entered into an agreement with Asiatic Petroleum Corporation, under which Universal made available to Bataafsche its engineering services and technical information in connection with one thermal cracking unit, one thermal reforming unit, and one polymerization unit. There is no evidence to indicate where this agreement was consummated, although it was approved at a meeting of the Board of Directors held in New York on May 2, 1945.

As to other activities of Universal within the Southern District, an A. A. Reynolds, who was in charge of freight shipments made three trips to New York during 1945. At these times he discussed with various parties the shipment of inhibitors. Some of the persons with whom he talked were representatives of companies which purchased inhibitors from Universal. The accounting voucher for one of these trips shows that the trip was for the purpose of "Inhibitor sales"; for another trip, for the purpose of visiting "major companies regarding inhibitor and catalyst sales." Another employee of Universal, Dr. Lowry, a chemist in charge of Universal's inhibitor department, made frequent trips to New York in which he discussed inhibitors with the representatives of various Universal inhibitor customers. The record indicates that the object of these discussions was to have the companies with whom he visited, buy inhibitors. He also transmitted to the inhibitor manufacturers the information gathered from these discussions. Many of Lowry's expense accounts state the purpose of these trips as "Inhibitor sales", although there is no evidence that Lowry ever secured an order within the Southern District of New York. L. A. Mekler, one of Universal's engineers, made three trips to New York, during which he had discussions with representatives of the Soviet Government Purchasing Commission. Mekler was not in the sales department. Universal's accounting vouchers show that the purpose of Mekler's trips in July, 1944, was "Sales foreign"; that made in September, 1944, was for the purpose of "Russia Sales"; and that made in January, 1945, was for the purpose of "U.S.S.R. Sales".

On July 24, 1942, the Petroleum Coordinator for War issued his Recommendation No. 41, which authorized Universal, Indiana, Shell Development Company, Standard Oil Development Company, Texaco Development Corporation and the M. W. Kellogg Company to establish a cross licensing and licensing arrangement and to carry forward co-operative research and development work respecting certain catalytic cracking and reforming processes. The recommendation was approved by the War Production Board on August 7, 1942. In the early part of 1944, these parties entered into an agreement providing that Universal and the Kellogg Company would serve as "licensing agencies," it being contemplated that the licensing agents would issue licenses under the patents of all of the parties in accordance with certain forms of license agreements approved by the parties and attached to the agreement. The agreement was executed by some of the parties within the Southern District of New York and by others, such as Universal, outside of the district. The negotiations which resulted in the issuance of licenses under the agreement took place outside the Southern District and the resulting licenses were executed by the licensees outside of the district. The original agreement and the subsequently granted licenses provided, however, that the legal relations between the parties shall be determined in accordance with the laws of the State of New York. Pursuant to the original agreement representatives of Universal met with representatives of the other parties from time to time to discuss the terms and conditions and

distribution of royalties provided for in the various licenses issued by the licensing agents. Eight of these meetings were held in New York, and others were held outside of the Southern District.

Other activities of Universal's employees within the Southern District were as follows: J. S. Bogen visited New York a number of times. The only evidence of his activities lies in two entries in Mrs. Mix's diary which state that on February 14, 1945 Mr. Tweedy, Anglo-American, called on Mr. Bogen, Mr. Verity, of the Foster Wheeler Company, a company engaged in refinery construction, phoned Mr. Bogen. Universal's travel authorizations and expense vouchers reveal that these trips were for the purpose of attending scientific meetings. In November 1944, Herman S. Block, one of Universal's research chemists, was sent to New York to discuss with members of the Trinidad Leaseholds staff problems in connection with the manufacture of chemicals at Trinidad's refinery. Gustav Egloff, one of Universal's research chemists, made many trips to New York to attend various society meetings. Universal's expense vouchers charged these trips to "publicity." M. D. Gilchrist, the head of Universal's Commercial Development Department made a number of trips to New York. On that made in January, 1945, Gilchrist, together with Vavra, a Universal employee, called on Dr. Carey of E. B. Badger & Company, a refinery construction firm. On January 11, Gilchrist and Vavra called upon Messrs. Reminschneider and Kraft of the Lummus Company, a refinery equipment construction company, and also called on Dr. Carey of the Badger Company. On a trip in June, 1945, Gilchrist had discussions at New York with representatives of two French companies, the Soviet Purchasing Commission, and the Burmah Oil Company. On June 5, 1945 he contacted representatives of the Ashland Company and A. Johnson Company, both licensees of Universal, and on June 7, held several conferences in the New York office. E. H. McGrew, Universal's chemical engineer in charge of the commercial manufacture of catalysts, made trips to New York in January, May, and July, 1945. The record reveals that on January 15, McGrew had lunch with a Mr. Bonnett of the American Cyanamid Company, a licensee and manufacturer of Universal catalysts. On January 17, 1945, he called on the Anglo-American Purchasing Company and on January 19, he called upon a Mr. Nehmes of the American Cyanamid Company. On January 24, 1945, McGrew had lunch with Mr. Carrad of Imperial Chemical Industries, a Universal licensee. On January 26, he called on Mr. Bonnett and later phoned Dr. Cholet of the General Chemical Company. On his May and July trips McGrew again contacted representatives of American Cyanamid. J. D. Seguy, an engineer of Universal, made numerous trips to New York for the purpose of conferring with counsel regarding litigation in which Universal was involved. On one occasion he held a conference with a representative of the Koppers Company regarding the settlement of a claim which had been preferred by Universal against Koppers. This meeting took place on October 4, 1945; on October 16, 1945, an agreement settling the claim was made with the Koppers Company. S. R. Wilson, whose duties were primarily related to the drawing of contracts and license agreements for Universal, made twelve trips to New York in the period June 1944 through September 1945. The accounting vouchers reveal the following purposes for some of these trips: July, 1944: "License agreements"; December, 1944: "cracking and chemical service"; March, 1945, "C & C service." The office diary of Mrs. Mix also reveals that on one occasion Wilson telephoned and called on Mr. Schad of Asiatic; that he telephoned one Laurent, a representative of the former French Licensees of Universal and Mr. Bonnett of American Cyanamid. In March 1945, while in New York, he called on Bonnett of American Cyanamid, and on Mr. Dearborn of the Texas Company. During two trips in May, 1945, the office diary also indicates that Wilson was in contact with Carrad of Imperial Chemical Industries, Liebrecht of the Kellogg Company, Sharpe of the Texas Company, and Norcross of the Standard Oil Development Company. Another Universal employee, G. B. Zimmerman, held on May 2 and 3, 1945, conferences at the Rockefeller Plaza offices.

with Messrs. Zavoico and Chadinoff, representatives of the French Petroleum Commission; and on May 4, 1945, he held a conference in the same offices with Messrs. Allibone and Downs, representatives of the Burmah Oil Company, a licensee of Universal.

■■ A corporation may be said to be "found" in a district when it is there present by its officers and agent carrying on the business of the corporation and doing business therein "of such nature and character as to warrant the inference that the corporation has subjected itself to the local jurisdiction, and is by its duly authorized officers or agents present within the district where service is attempted." Peoples Tobacco Co. v. American Tobacco Co., 246 U.S. 79, 84, 87, 38 S.Ct. 233, 62 L.Ed. 587, Ann.Cas.1918C, 537. The word "found" seems to be synonymous with the words "doing business." To justify a finding that a corporation is found in a district requires a greater amount of "doing business" than would justify a finding of "transacting business" referred to in section 12 of the Clayton Act. Hansen Packing Co. v. Armour & Co., D.C., 16 F.Supp. 784-786. The definition of "doing business" seems to me to have been amplified in International Shoe v. State of Washington, 326 U.S. 310, 316, 317, 318, 66 S.Ct. 154, 90 L.Ed. 95, where it is said that due process requires only that in order to subject a defendant to a judgment in personam, if he be not present in the district of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice; presence in the state in this sense has never been doubted when the activities of the corporation have been continuous, substantial and systematic; casual presence or conduct of single or isolated items of activity are not enough; whether due process is satisfied must depend upon the quality and nature of the activity in relation to the fair and orderly administration of the law. These statements are to a considerable extent a reiteration of what had already been written by Judge Learned Hand in Hutchinson v. Chase & Gilbert, 2 Cir., 45 F.2d 139-141, where it is recorded:

"It is difficult, to us it seems impossible, to impute the idea of locality to a corporation, *except by virtue of those acts which realize its purposes.* The shareholders, officers and agents are not individually the corporation, and do not carry it with them in all their legal transactions. It is only when engaged upon its affairs that they can be said to represent it, and we can see no qualitative distinction between one part of its doings and another, so they carry out the common plan. If we are to attribute locality to it at all, *it must be equally present wherever any part of its work goes on, as much in the little as in the great.* * * * There must be some continuous dealings in the state of the forum; enough to demand a trial away from its home."

In that case, judgment of dismissal was affirmed. It involved a corporation whose business was that of "engineering management" of public utility corporations of whose shares the corporation owned a controlling interest. The suit was for services for the purchase for the defendant of certain shares of stock. Significantly Judge Hand said: "Had its (the defendant's) business been primarily in dealing in the shares of public utility companies, and had it had a local agent, whose duty it was to bargain for these, it may be that it could not escape (from the jurisdiction where sued) merely because he had no power to close purchases here, but must refer them to the home office. This was not the case."

■ I cannot find in the cases any absolute requirement that there must be a continuous flow of goods into the district in order to sustain a finding that a particular corporation is found there. Here it seems obvious that the New York office was maintained, and employees and officers of the defendant frequently visited this district, for the purpose of conducting the business of the company, particularly that of licensing and of supplying engineering services and advice. That office was maintained, partially if not largely, for the convenience of its licensees and customers. It presented a handy place for conferences, for inquiries and for other matters which from time to time were necessary to be accomplished in the business of the company, and I think much was accomplished. The

officers and employees visited here whenever it was necessary to convenience its customers and to carry on its corporate business. Here one of the many branches of Universal's activity was its service of engineers, chemists and scientists. That service, if there should be a requirement for a continuous flow of goods into the district, continuously and whenever required did flow into this district. It had done so over a period of many years and was continued even after the company had reduced expenses by moving into a smaller office. It continued before and after the service of process. I think it can clearly be said that Universal was found here. Adolph Meyer, Inc., v. Florists Telegraph Delivery Association, D.C., 16 F.Supp. 783. United States v. Univis Lens Co., 316 U.S. 241-246, 62 S.Ct. 1088, 86 L.Ed. 1408.

The motion of the defendant Universal will be denied.

### Standard Oil Company of California.

Standard Oil Company of California is a Delaware corporation, and the summons and complaint were served upon it in San Francisco on March 21, 1945. It is claimed that it is "transacting business" in this district through California Commercial Company, Inc., its subsidiary.

Generally it may be said that a corporation is transacting business within a district if in the ordinary and usual sense its business there is of a substantial character and is continuous as distinguished from single or isolated transactions. If such business is transacted by a subsidiary, that does not constitute business done by the parent if the subsidiary maintains a separate legal entity. But if the subsidiary is in effect a mere instrumentality or adjunct of the parent corporation and appears to be used as a blind to defeat public convenience, the corporate entity may be ignored. Eastman Kodak Co. of New York v. Southern Photo Materials Co., 273 U.S. 359–373, 47 S.Ct. 400, 71 L.Ed. 684; Jeffrey-Nichols Motor Co. v. Hupp Motor Car Corp., 1 Cir., 46 F.2d 623, 624; Hutchinson v. Chase & Gilbert, 2 Cir., 45 F.2d 139–141. In Amtorg Trading Corp. v. Standard Oil Co. of California, D.C., 47 F.Supp. 466, decided in 1942, I held that this corporation was not doing business in this district. There the process was served upon the California Commercial Company, Inc., and not, as here, upon the corporation itself. That was not an anti-trust case, but was a libel brought to recover damages for the failure of a ship chartered by Standard to the libellant to deliver a cargo. It was necessary there to determine whether Standard of California was doing business in this district, or, in other words, whether it was "found" here, in order to justify its being sued here. As is apparent from the decisions cited above, under the discussion of the status of Universal, a determination that a corporation is "found" in a district requires more proof than would be requisite to constitute "transacting business".

As was held in the Amtorg case, plaintiff has the burden of establishing jurisdiction. Whether it has sustained that burden must be ascertained from the affidavits of H. D. Collier, this defendant's president, verified April 4, 1945, of Arthur R. Carruthers, a vice president of Commercial, verified April 9, 1945, submitted upon the original motion; the affidavit of Fred C. Koch, plaintiff's president, verified May 14, 1945, submitted in opposition to the motion; the affidavits of Raymond M. Miilu, a vice president of Commercial, verified June 8, 1945, and of said H. D. Collier, verified June 6, 1945, submitted in reply; the testimony by deposition of Harvey G. Denham, the former president of California Commercial Company, taken by the plaintiff on December 12, 13 and 14, 1945 and the twenty-four exhibits then offered; and the stipulation of counsel dated January 21, 1946 as to the probable testimony, if called, of Richard H. Morse, secretary and treasurer of California Commercial Company, Inc., and of said Raymond M. Miilu. From these, the following facts may be culled:

Defendant is engaged in the business of producing, refining, transporting and marketing petroleum and its products, and is qualified to do, and is doing business, in Arizona, California, Idaho, Nevada, Oregon, Utah, Washington, Alaska and Hawaii. It is not qualified to do business in the

Southern District of New York, and has no employee resident therein. It owns no real estate or other property in this district, does no manufacturing here, and only one of its directors resides or has a place of business within this district. All meetings of stockholders and directors are held without the district. It also appears that the title to all merchandise sold in this district passes into the buyer before the merchandise enters here. No collections are made here, nor are invoices or bills sent from this district, and the only goods and merchandise shipped to buyers in this district during the year 1944 consisted of wheel bearing grease and refined wax, of a total value of $783.51, representing .00027 of 1% of the total of all sales for the year 1944, made by defendant in its entire business.

California Commercial Company, Inc., is a New York corporation, with its place of business in New York City, and is a wholly owned subsidiary of defendant. It is an independent corporate entity, and performs services for and receives compensation from defendant and various companies, all of whom are wholly or partially owned subsidiaries or affiliates of defendant. It has its own board of directors, maintains complete corporate books and records, separate bank accounts, and is adequately capitalized for its ordinary business purposes. None of its officers, directors or employees is such of the defendant, nor have they any authority to consummate or execute any contracts or enter into binding commitments in defendant's behalf. There is listed on the building directory in which California Commercial does business the words, "Standard Oil Co. of California, see California Commercial Co. Inc. 4425," and in the New York City telephone directory appears "Standard Oil Co. of California call California Com'l Co. Inc. Columbus 5–1192." From time to time California Commercial receives inquiries from prospective purchasers of petroleum or petroleum products of Standard of California, and all such inquiries are forwarded to the principal office of the defendant in San Francisco. It is the duty of California Commercial, under its contract with the defendant, to maintain contacts with executive offices of business enterprises in New York and elsewhere, to which Standard of California sells petroleum products for delivery and use outside of this district; for this purpose, Commercial's employees call at the New York City offices of these business enterprises, but neither Commercial nor its employees is entitled to accept any order or to commit Standard of California in any way; if an order is received, it is transmitted to Standard of California outside of this state. California Commercial does not bill any of the customers of defendant, nor are bills of the defendant sent out through California Commercial or handled by any of its employees; and no payments on behalf of defendant are received by California Commercial, nor does it make any collections or efforts to collect sums due defendant. California Commercial under its contract has the duty of contacting companies from whom defendant desires to purchase products to be delivered and used outside the district, and in that connection, employees of California Commercial make inquiries at executive offices of such companies in New York City and forward the result to defendant outside of the state. California Commercial is not authorized, except when especially requested, to make any offer, does not place any orders, or make any payments on behalf of the defendant. It does perform certain functions in arranging for transportation of defendant's products in interstate commerce or for export; but all contractual commitments covering such transportation are made directly by defendant outside of this state.

The Chase National Bank of New York City is transfer agent of the company and its registrar agent is National City Bank of New York City, as required by the rules of the New York Stock Exchange, upon which defendant's stock is listed. Defendant also has a transfer agent and registrar in San Francisco.

The publication, Standard Corporation Records, lists defendant as having an office at 30 Rockefeller Plaza, New York City, but defendant states that it has not authorized any such statement and affirmatively avers that it has no office in this district.

Some of the companies to which Standard of California has sold crude oil and from which it has procured that product, reside or have headquarters in New York City, but no such transactions are negotiated or consummated in this district, and the points of contact between defendant and such companies are outside of New York State. It does not service any such transactions in this state.

For its convenience, defendant maintains substantial deposits in New York City banks. Bahrein Petroleum Company, Ltd., Arabian American Oil Company and California Texas Oil Company, Ltd. are partly owned foreign subsidiaries of defendant and each of them has offices in New York City, but no business transactions are carried on in New York State between any of them and defendant. Defendant's export business is handled directly and entirely through its export department in San Francisco and California Commercial refers any inquiries it may receive with respect to such business to San Francisco.

In January 1940, defendant discontinued its offices at 30 Rockefeller Plaza and formed the California Commercial Company, Inc., with offices in the same suite and with the same telephone number formerly used by defendant; and the offices and employees of Commercial are performing the same services and discharging the same duties which many of them formerly did while employed by defendant or which were formerly done by its employees. The former employees of defendant in New York City, however, had no authority to execute contracts, or to transact and conclude any business affairs for defendant; they were authorized to make business contacts in this district and the surrounding territory. Prior to the time California Commercial was organized, certain foreign corporations in which defendant had an interest, were engaged in the development of oil fields in Arabia and Egypt. Large quantities of supplies and equipment were being purchased by them partly through New York sales offices of suppliers and were being shipped from New York. Freight forwarding agents were being paid by these corporations sums totalling over $50,000 a year as commissions for arranging for such shipment; and it was primarily for the undertaking of this business that California Commercial was organized. The officers and employees of the corporation are neither hired, paid nor discharged by defendant. California Commercial is a participating subsidiary in defendant's pension plan, its employees having the same rights as to seniority and pensions as are extended to other employees of participating subsidiaries. California Commercial never had any authority to charter defendant's tankers to anyone. Such chartering prior to April 1942 was handled exclusively by defendant's marine department in San Francisco, and since April, 1942, the tankers have been requisitioned time chartered to the War Shipping Administration.

Defendant's products are sold in the New York area by New York Lubricating Oil Company, which has offices in this district but whose plant is located in the State of New Jersey. Purchases of these products are consummated, and title passes, outside of this district, and the products are delivered by defendant in New Jersey.

Mr. Harvey G. Denham, who was president of the California Commercial from May 1943 until January 15, 1945 (it will be remembered that the summons and complaint were served upon Standard of California on March 21, 1945), and who, since then, has been manager of sales for the Arabian American Oil Company, in which the defendant has a 50% interest, the Texas Company owning the other 50%, was the only witness called by the plaintiff to give oral testimony as to the facts relevant to the present inquiry. The services of representation under a contract between defendant and California Commercial of August 31, 1942, were detailed by him. Defendant was interested in general information pertaining to the petroleum industry in the east, such as changes in crude prices and market trends, new products, general economic conditions affecting the oil industry and news items of interest as well as marketing methods of other oil companies. California Commercial gathered and forwarded to San Francisco this information. There were certain check ups necessary in connection with the purchase and expediting of supplies and materials which defend-

ants and its affiliates and subsidiaries were interested in obtaining, and California Commercial endeavored to find supplies for those materials and inform defendant where those sources were and give them general information about what was to be obtained, prices, etc. If defendant wished to make purchase, it would place an order directly upon the supplier who would invoice the defendant directly. California Commercial would assist in expediting shipments by contacts with shipping brokers, mostly, however, in connection with overseas shipments. Defendant required Pennsylvania lubricating oils and other eastern oils and waxes, and California Commercial was in touch with suppliers of such material and would forward offers of suppliers to San Francisco. Other suppliers, without request of California Commercial, would come to it and present something which defendant might be interested in buying, and that was transmitted to San Francisco. If defendant was interested, orders were placed directly with the supplier and invoiced to San Francisco, where the bills were paid directly. There were wholesale accounts of many years standing who had been purchasing from defendant on the Pacific coast, chiefly for export, and California Commercial ascertained from these people their requirements and forwarded the information to San Francisco, and the business, if any resulted, was consummated with contracts being drawn in San Francisco, and California Commercial had no part in it. Certain Pacific coast accounts had head offices in New York and California Commercial, at the request of the defendant, conveyed certain information to these accounts in New York or checked up with them about certain matters having to do with sales in the west, but concluded no arrangements in New York. If defendant had a product which it would like to market in the east, Commercial would investigate and report to San Francisco. That was so all during the period from January 1, 1944, to January 15, 1945, which was the period during which plaintiff's counsel stated he desired to inquire, and which it has been stipulated the witness Miilu would testify continued to June 30, 1945. Some of the

business of the company was transacted by personal visits to the accounts, and sometimes they were telephoned to when specifically requested by defendant. There were never any requests to get after delinquent accounts for the sake of getting payment.

The services performed by California Commercial for the defendant were performed and paid for pursuant to the agreement dated August 31, 1942; and for the year 1944, and the first three months of 1945, less than 20% of the business of California Commercial was represented by services performed in New York State for the defendant. The agreement specifies that California Commercial shall perform such service of representation as Standard of California may from time to time request, and Standard of California agrees to pay therefor monthly the cost thereof plus 25%. Records reflecting the amount of time spent shall be kept by Commercial, and overhead and other items of expense shall be allocated reasonably. Taxes shall not be included.

California Commercial had contracts of similar nature with the other subsidiaries or affiliates of Standard of California; and carried on no activities other than in services performed for the defendant and its subsidiaries and affiliates. None of the defendant's subsidiaries, except Arabian American Oil Company, had any office in the Southern District of New York during the period in question. None of Commercial's employees made any regular or repeated contacts with any companies in New York. Contacts were made only at the request of the defendant, and were more frequently made by telephone than otherwise, occasionally by calling, and occasionally by writing.

My attention is called by plaintiff to 18 of the letter exhibits introduced in evidence by it during the taking of Mr. Denham's deposition.

Exhibit 102 is a letter from defendant to California Commercial. It does not reveal any other service than has already been shown to have been rendered by Commercial to defendant. It refers to bunker

fuel furnished to three steamship companies on the west coast and to no deliveries or contracts made in this district.

Exhibit 103 is a letter from the defendant to Commercial referring to the business of the National Biscuit Company on the Pacific coast and products of that company manufactured there. In order to procure a sale out there, a sample of one of the defendant's products is to be sent here for examination by that company's chemist, and prices are quoted in the hope that defendant may procure such west coast business. The letter concludes, "We should appreciate your assistance in securing this very desirable business". It does not appear what was done, whether business was secured, and in any event, it was no business to be accomplished in this district.

Exhibit 104 is a letter between the parties with reference to obtaining the signature to the Petroleum Products contract covering the Pacific coast operations of the Continental Baking Company, and concludes with the words. "We should appreciate your keeping us posted of the further negotiations with this customer." It does not reveal any more than has already been shown above.

Exhibit 105 is a similar letter regarding the sale of asphalt in Peru and quotes prices of that product delivered at San Francisco and Los Angeles. If the proposed purchaser is interested, Commercial is requested to advise defendant as to quantities involved, delivery dates, etc. and "We will be glad to let you know whether we can supply."

Exhibit 106 is a similar letter relating to the Transmares Corporation with reference to the export of asphalt to the west coast of South America. Prices of delivery at the same places are similarly quoted and the letter concludes with a statement that the offer is open for acceptance on or before February 15, 1945. The letter merely requests California Commercial to contact the proposed purchaser and submit figures. So far as the evidence shows nothing resulted.

Exhibit 107 is a similar letter with reference to some reciprocal bunker oil arrangement between defendant and Standard Oil Company of New Jersey, and relates largely to the contract, but it is specifically noted in several places in the letter that any changes which Standard of New Jersey may desire to make shall first be referred to defendant for approval, and Commercial is requested to report to defendant as soon as possible.

Exhibit 108 is a similar letter upon substantially the same subject matter with reference to some reciprocal arrangement in the east by which Standard Oil Company of New Jersey will take care of defendant's business on the east coast and defendant will do likewise for Standard of New Jersey on the west coast. It does not appear from that letter that any business was done or contemplated to be done in this district other than the mere contacting by Commercial with Standard of New Jersey on the subject.

Exhibit 109 refers to deliveries of bunker fuel to the three steamship companies mentioned in Exhibit 102, and another steamship company, with reference to the acute Pacific coast bunker situation and scarcity. It does not refer to any business in this district and merely asks for a report on the suggestion that there be called to the attention of the four steamship companies the deficit and the necessity that future orders be confined in quantity. No part of the business, other than the contact by Commercial as requested, seems to have been done in this district.

Exhibit 110 is another letter upon the same bunker oil situation and the reciprocal arrangement between Standard of New Jersey and the defendant and the payment of commissions one to the other in the matter. The reference is largely to business done on the west coast and in the Hawaiian Islands and South Pacific ports. There is no reference to business done in this district, and defendant merely requests California Commercial to get and submit Standard of New Jersey's views on the proposal made by the defendant.

Exhibit 111 is a letter with reference to the supplying of cutting oil on the west coast to various customers, including the

Hercules Chemical Company which is said to have an office in New York City, and who, it is stated, are presently selling quite a volume of cutting oils to hardware houses on the Pacific coast. The witness did not believe that any such company was located in New York City, but thought that it was located in some other state. However, California Commercial was merely asked to contact such a company to ascertain whether it would be interested in defendant supplying their requirements on the Pacific coast. It does not appear what was done or where it was done.

Exhibit 114 is a teletype message from San Francisco to New York inquiring whether California Commercial can obtain some solvent and at what price, specifications and terms. It contemplates the rendition of no other service than has already been testified to.

Exhibit 115 is another teletype message from San Francisco to New York upon the same subject, asking California Commercial if they could arrange for a cancellation of an acceptance by Atkinson so that defendant could increase an order from another source, and Commercial was asked to please advise the outcome.

Exhibit 117 is a letter from San Francisco to Denham calling his attention to the fact that a steamship was to be delivered to the Consolidated Ship Building Corporation, at Wilmington, California, and stating, "Your solicitation of the lubricating oil business of this vessel will be greatly appreciated." Whether or not any business resulted is not shown. It will be presumed that the business was solicited, but this apparently is only one sporadic instance of a similar request and does not show that California Commercial was regularly engaged in such solicitation nor that any business resulted therefrom.

Exhibit 118 is a letter to Mr. Denham from San Francisco attaching a new fuel oil contract with the Isthmian Steamship Company. Commercial is merely asked to endeavor to close the deal at the earliest opportunity, "returning the contracts for approval and execution in the usual manner." There is nothing to be found in this letter than has not already been shown. From previous correspondence it would appear that the contract refers entirely to the delivery of bunker and diesel fuel other than in the Southern District of New York.

Exhibit 119 is a telegram from San Francisco to California Commercial requesting Commercial to offer to the Standard Vacuum Company certain products of the defendant at certain prices and stating that the option will be open for acceptance until February 23, 1945.

Exhibit 120 is a letter from San Francisco to New York referring to a letter from the Los Angeles district manager of the defendant regarding the opening of an office in New York City by the Morrison-Knudsen Company, "one of the largest Pacific coast contracting concerns and a good customer of ours," stating that Mr. Carruthers, a vice-president of California Commercial "will probably wish to call on and become acquainted with their New York representatives."

Exhibit 121 is a letter from San Francisco to New York enclosing an invoice against the Balboa Transportation Corporation, stating that payment has not been received, and "Will you please be kind enough to have someone contact the above account in the interest of expediting payment, advising this office the results of your efforts." It does not appear whether any collection was made by California Commercial or that any payment resulted from their efforts. Mr. Denham testified that occasionally services of this kind were rendered, particularly where the War Shipping Administration was involved as it apparently was in this instance, and in which from time to time files concerning such payments were misplaced or lost.

These instances, in my opinion, do not reveal in any way the rendition of further or other services than have already been testified to and do not establish the transaction of business of any substantial amount in this district.

 It does not appear that there is any material difference between what appeared in the Amtorg case, supra, and what is now shown. Plaintiff, in my judgment, has not shown that this defendant is "transacting business" in any substantial amount

in this district. Defendant's motion is, therefore, granted.

### Standard Oil Company of Indiana.

Standard Oil Company of Indiana is an Indiana corporation, and has its principal place of business at Chicago, Illinois. The summons and complaint were served upon it on March 21, 1945 in Indiana. It is claimed by plaintiff that defendant "transacts business" in this district through Randol Taylor, its Eastern Sales Representative.

The facts relating to this defendant's activity in the Southern District of New York are shown in its moving affidavits, and in the depositions with the exhibits introduced during the course thereof. Very little can be taken from the affidavit of Mr. Koch, verified May 14, 1945, because practically all of his statements with reference to Standard of Indiana are upon information and belief.

At the time of service, defendant was engaged, either directly or in association with subsidiaries or affiliated companies, in the production, refining, manufacturing, distribution and sale of petroleum products. It refined and manufactured petroleum products in Illinois, Indiana, Missouri, Kansas and Wyoming; and concededly sold its products in Montana, Wyoming, Illinois, Iowa, Colorado, Michigan, Minnesota, Indiana, North and South Dakota, Wisconsin, Missouri, Oklahoma, Kansas and Nebraska. In all of those states, it was duly qualified to transact business. The products of its refining processes, carried on principally at Whiting, Indiana, are gasoline and various types of oil, as well as certain byproducts, such as naptha and wax candles. It does not carry on any production, refining or manufacturing business within the State of New York. Its sales business is conducted principally from its head office in Chicago and from some thirty branch offices maintained in the middle western states mentioned; and the question here is whether such sale and marketing business is also transacted here.

Randol Taylor is employed by the defendant to act in the capacity of Eastern Sales Representative, and he has an office in New York City. He is listed in the New York Telephone Directory under his own name, with no reference to any connection with the defendant. His territory consists of the northeasterly portion of the United States, including that portion generally east of the Appalachian from West Virginia and Virginia north through and including New England. Mr. Taylor pays rental for his office in New York by his own personal check or cash, and he is reimbursed by Indiana for that expense with others in connection with any services he performs for it. The name of the defendant does not appear upon any bulletin board or in any telephone book or upon any door within the State of New York. Taylor is paid $7500. as salary for his services by check of the defendant drawn on a Chicago bank. Defendant maintains no warehouse in New York, or any stock of merchandise or other products, makes no collections in New York, no invoices are sent out and no billing is done there, no meetings of stockholders or directors are held there, and none of its books of account or records of account are kept there.

Many of the corporations, which do business within the middle western territory served by defendant, have offices located in New York. Defendant's moving affidavit states that principally for the purpose of contacting those offices, in connection with sales to be made in the middle western states mentioned, Mr. Taylor is employed "for the purpose of inducing" those corporations "to use Indiana's product in their middle western plants." Taylor avers, "Where, as the result of my (his) calls, any business may be forthcoming, the matter is dealt with at Indiana's Chicago office." He has no authority to accept orders on behalf of defendant or to conclude any contracts whatever. Occasionally he may receive an inquiry or order calling for shipment of defendant's product into the territory east of the Appalachian Mountains and those orders are submitted by him to the Chicago office of defendant where action is taken.

The major portion of defendant's petroleum products delivered into the territory east of the Appalachian Mountains is shipped f.o.b. one of the defendant's refineries and from a plant outside of the State of

New York. All billing therefor is done from Chicago and all collections are there received. The volume of products which ultimately reaches the territorial limits of the Southern District of New York is small, and in 1944 was less than .00023 of 1% of the Taylor volume of Indiana's total sales and did not amount to more than $513.53. For the period from January 1, 1944, to April 30, 1945, sixteen months, the sales with which Taylor had any connection in this district, amounted to $1,034,867.56, and of these $2,419.24 reached destination here.

In addition to the foregoing, Mr. Taylor calls upon customers when he is advised that they have some complaint and seeks to placate the same, but has no authority to make and never has made any adjustments or settlements whatever with respect thereto. He has never signed any contract on behalf of defendant and has no authority to waive or modify the terms of any contract. He does not investigate the credit of any customers whom he may contact, and has no authority to pass upon any credit question.

It seems fairly well established by the record that defendant deems it essential to have a representative, under the control of its sales department, permanently located in this district, particularly for the accommodation of its customers who want to do business here.

Pan American Petroleum & Transport Company and American Oil Company have offices in the same building as has Mr. Taylor. Mr. Taylor's office is a part of the premises occupied by these two corporations and his and their telephone number is the same. Taylor's rent is paid to the American Oil Company. Defendant owns three-fourths of the capital stock of Pan American which, in turn, owns all of the outstanding stock of the American Oil Company. The board of directors of Pan American consists of nine members, of which three are also officers and directors of defendant, who are also members of Pan American's executive committee. Each of the corporations has a separate corporate existence and their books are not kept by defendant. None of the defendant's business is transacted through either corporation and neither collects money, sells any products or does any business within this district or elsewhere as agent of the defendant.

Plaintiff's Exhibit 26, which consists of 24 weekly reports of "Sales Activities" by Mr. Taylor, introduced during the taking of Mr. Taylor's deposition, details what he did between January 1 and March 23, 1945. Aside from visitations when contracts were presented for signature by various customers of defendant, and when were discussed prices of various products of defendant, the following instances seem important:

On January 4, he apparently sold to the Railway Express Agency, located at Milwaukee, Wisconsin, five barrels of motor oil. On January 5 he states that he secured an order for shipment to the Quality Bakers in Salisbury, North Carolina, of petrolatum oil. This is listed on that report under the headings "Business Secured" and "Sale", and does not seem to have been a part of any contract previously entered into. In that same report is listed a further sale under contract to the same purchaser at Decatur, Illinois, of a barrel of oil and a barrel of grease.

On January 9 he sold insect spray to the Continental Baking Company for delivery at Milwaukee, Wisconsin, and Buffalo, New York, apparently under a contract.

On January 11 he reports that he secured 1945 lubricating contracts from Lind Air Products, which involved some 1245 barrels of oil and grease. He also reports a sale of oil to the West Disinfecting Company of Chicago, Illinois, under contract.

On January 12 he reports that Mr. Brown of the American Car & Foundry Company will give a new blanket order for the first half of 1945 at North Kansas City.

On January 16 he discussed with a Mr. McIntyre of the S. H. Kress Company, an order for Halloween candles and states that they will send in an order at an early date. He also reports three sales under contracts, one to Quality Bakers, another to the United States Rubber, at locations outside of the district.

On his report for the week ending January 26, 1945 he reports the sale to the

Bound Brook Oil-Less Bearing Company at Bound Brook, New Jersey, two sales to Continental Baking Company at various points, another sale of 80,000 pounds of wax to Cornell-Dubilier Electric Company at New Bedford, Massachusetts, 8,448 boxes of Halloween candles to S. H. Kress at various points, grease and oil to Quality Bakers at various points, and 50 barrels of oil to the West Disinfecting Company at Chicago. The sales to Continental Baking Company, Quality Bakers and West Disinfecting were apparently on some existing contract.

On the report for the week ending February 2, 1945, he reports sales to Continental Baking Company, General Printing Ink and Quality Bakers, all apparently on existing contracts, and one of 2,000 pounds of wax to the Solar Manufacturing Company at Bayonne, New Jersey.

For the week ending February 9, he reports the sale of 5,000 gallons of car oil to the American Car & Foundry at Chicago, and other sales to the Continental Baking Company, Quality Bakers and Railway Express Agency, for points outside the district, the latter being apparently upon existing contracts.

For the week ending February 16, he reports the sale of 4,000 gallons of oil to the American Car & Foundry Company, and 2500 gallons to E. I. DuPont de Nemours Company, at places outside of the district, and also, apparently upon existing contracts, of sales to Quality Bakers and United States Tobacco. In connection with the DuPont de Nemours contract, Mr. Taylor reports interviewing Mr. Greer at Wilmington, Delaware (apparently the call being placed in New York because there are other entries on that same day from New York), to obtain an order for the 2500 gallons of oil for immediate delivery to Flint, Michigan. It also appears that on February 16, he discussed with Mr. Fogg of the Ogden Corporation a certain lubricating contract and "Made some revisions and presented for their review and acceptance" lubricating contracts.

For the week ending February 23, he reports sales of grease to the American Smelting & Refining Company in New-

foundland, and oil to Joseph Dixon Crucible Company in Jersey City, and also, apparently under existing contracts, of oils to the General Printing Ink Company, grease to Quality Bakers, and wax to the United States Rubber Company, for delivery outside of the district.

With reference to the General Printing Ink sale, the entry under date of February 20 is that Mr. Taylor "secured order for 40,000 gals. to be delivered during March".

With reference to the United States Rubber Company sale, the entry under date of February 23 is "Secured order for 2 carloads for delivery during March to the Naugatuck Plant" in Connecticut.

On the report for the week ending March 2, 1945, are reported sales by Mr. Taylor of oil to the American Car & Foundry Company at Chicago, Illinois, and Huntington, West Virginia, and of oil to the E. I. DuPont de Nemours Company of Flint, Michigan; and, under contracts apparently existing, sales to the Continental Baking Company, Quality Bakers, Railway Express Agency and West Disinfecting Company. The same report under date of February 26, with reference to the West Disinfecting Company shows an interview with Mr. Oppenheimer at Long Island City and the statement "Secured order for 10 t/cs to be delivered to their Chicago plant as called for by the plant."

Under date of February 27, with reference to the American Car & Foundry Company order is the statement "Secured orders for Chicago, Ill., and Huntington, W. Va."

Under date of February 28, after an interview with Mr. Greer, apparently by telephone, at Wilmington, Delaware, he secured an order from the DuPont de Nemours Company for Flint, Michigan.

For the week ending March 9, 1945, Mr. Taylor reports two sales, one under contract to Quality Bakers, and the other apparently not under contract, of 30,000 pounds of wax to the United States Rubber Company at Mishawaka, Indiana.

On the report for the week ending March 16, 1945, Mr. Taylor reports three sales, as business secured apparently under existing contracts one, to the General Printing Ink Company, the second to the Quality Bakers,

and the third to Railway Express Agency, and a further sale of 100 pounds of wax to the Maguire Industries, after an interview with their Mr. Robbins, as to which he gave them information as to the price.

For the week ending March 23, Mr. Taylor reports a sale of 100 pounds of wax to American transformer Company at Newark, New Jersey, and, apparently under contracts existing, of sales of grease and oil to Quality Bakers and of wax to the United States Rubber Company.

For the week ending March 30, 1945, although Mr. Taylor states that he was in the Chicago office from March 26 to March 30, he reports sales to the American Smelting & Refining Company of oil and to the American Transformer Company of wax. He also reports four other sales, apparently under existing contracts, of oil to the Continental Baking Company, Quality Bakers and Railway Express.

It is to be noted that on all of the reports of Mr. Taylor, the information with reference to "Sales" is under the heading of "Business Secured."

In a letter dated November 11, 1943, part of Exhibit 30, from the Chicago office of the defendant to Mr. Taylor, and referring to the gasoline contract of the Borden Company, Mr. Taylor was informed that the existing contract covered deliveries only during the year 1944, and the letter ended with the sentence, "Will you please try to secure renewal at this time?". Apparently the renewal was procured for in the following year under date of November 17, 1944, Mr. Taylor was again requested to try to secure another renewal. He was similarly requested to secure a renewal contract from Chicago Pneumatic Tool Company in a letter dated December 17, 1943, which ended, "We trust that you will have no difficulty in getting the contract signed and will be interested in hearing from you in due course of time as to the outcome of your negotiations."

A somewhat similar letter is that of June 6, 1944, with reference to a renewal contract with the Commonwealth & Southern Corporation.

Mr. Taylor was reminded by letter of January 12, 1944, with reference to the sale of Halloween candles to S. H. Kress & Company. It was suggested that he contact that concern for the Halloween season candles because if they were to insure a supply for that year, "It would be wise for them to place a firm order at once the same as they have done in the past few years. Please let us know how you come out after you have contacted the buyer."

· A similar letter was written to Mr. Taylor on January 10, 1945.

A further review of the evidence would seem unnecessary. The evidence presented, in my opinion, justifies a finding that there was both solicitation of sales, and sales, in this district, continuous in course and of a substantial nature, and that at the time of the service of process on this defendant, it transacted business here.

Business of a certain kind may be done in a district, and where there is nothing more than solicitation it does not confer jurisdiction. Green v. Chicago, B. & O. R., 205 U.S. 530–533, 27 S.Ct. 595, 51 L.Ed. 916. If that is still true, it readily yields to slight additions. Hatchinson v. Chase & Gilbert, 2 Cir., 45 F.2d 139–141. Where the services are comprehensive in character, and contribute to the value and efficiency of defendant's business, both at its home office, and throughout the rest of the country, there is more than solicitation. Adolph Meyer v. Florists' Telegraph D. Ass'n., D. C., 16 F.Supp. 783; Sure-Fit Products Co. v. Fry Products, D.C., 23 F.Supp. 610–612; Katz Drug Co. v. W. A. Sheaffer Pen Co., D.C., 6 F.Supp. 210–211.

The motion of this defendant is denied.

The orders to be entered hereon will be settled on notice.