**WINKLER–KOCH ENGINEERING CO. v.
UNIVERSAL OIL PRODUCTS CO.
(Delaware) et al.**

United States District Court
S. D. New York.

July 16, 1951.

Paul Kolisch, New York City, J. Bernhard Thiess, Thorley von Holst, Sidney Neuman, Robert W. Poore, and Ralph E. Church, Jr., all of Chicago, Ill., of counsel, for plaintiff.

Chadbourne, Parke, Whiteside, Wolff & Brophy, New York City, Leonard P. Moore, New York City, of counsel, for Atlantic Refining Co.

M. S. Gibson, New York City, for Gulf Oil Corp.

Townley, Updike & Carter, New York City, George Townley, New York City, A. Leslie Hodson, Chicago, Ill., of counsel, for Standard Oil Co. (Indiana).

Oscar John Dorwin, New York City, for Texas Co.

E. M. Freeman, New York City, for Gasoline Products Co.

Cahill, Gordon, Zachry & Reindel, New York City, for M. W. Kellogg Co.

Davis, Polk, Wardwell, Sunderland & Kiendl, New York City, for Standard Oil Co. (New Jersey).

Cravath, Swaine & Moore, New York City, for Shell Union Oil Corp.

NEVIN, District Judge (sitting by designation).

On August 18, 1948, with the consent and upon the agreement of all the parties to this action, an order (later to be referred to) was approved by Chief Judge Knox, wherein it was provided *inter alia* that "the issues presented by the affirmative defenses of the statutes of limitations to the claim asserted in the particularized complaint be tried as separate issues in advance of the trial of the other issues of this action". Subsequently the "separate issues" thus to be tried were referred by Judge Knox to the present judge (of Dayton, Southern District of Ohio) who was then sitting by designation as a judge in New York, in the Southern District of New York.

Extensive and rather voluminous briefs having in the meantime been filed, on behalf of each of the parties respectively, the cause came on for hearing on December 12, 1949, by way of oral argument on the "separate issues" referred to in the order of Judge Knox.

The oral arguments occupied the whole of two days. During the arguments there was filed with the Court, on December 13, 1949, a document containing "Stipulations of facts and presentation of issues entered into between counsel for the plaintiff and counsel for the respective defendants". This document was marked "Court's Exhibit 1" for the purposes of the "separate trial."

On May 5, 1950, in open court with counsel present, the court in an oral opinion, rendered its decision. That decision is reported in 96 F.Supp. 1014. Inasmuch as it is now readily available to anyone interested, it is unnecessary to refer to it here in detail.

No order, based on that decision, has ever been entered. This for the reason that defendants filed a "Motion for reargument and rehearing" stating therein that "oral argument of this application for rehearing and reargument is respectfully requested". Plaintiff expressed the "view that no oral reargument of the issues of the separate trial is appropriate unless this Court sees fit to entertain a petition for rehearing and order such a reargument".

The court concluded that defendants' "Motion for reargument and rehearing" and the oral argument requested therein should be granted.

Accordingly, counsel for all the respective parties agreeing thereto, the oral argument was set for June 14, 1950, at Dayton, Ohio. At the appointed time all interested counsel appeared in court. The oral arguments again occupied the whole of two days—June 14 and 15, 1950.

A transcript of these arguments was later delivered to the court. That transcript the court has before it, along with the briefs previously filed, as well as letters from counsel sent to the court after June 15, 1950, in which reference is made to certain decisions, then available, which counsel submit support their contentions.

Shortly before the transcript was delivered to the court, the court received a letter dated October 26, 1950 (copies to counsel for plaintiff and other defendants) from Mr. A. L. Hodson, of counsel for defendant, Standard Oil Co. (Indiana). In his letter, Mr. Hodson says: "You mention to Chief Judge Knox (in a letter to him) that the transcript of the reargument will shortly be completed and that you will start your reexamination of the case as soon thereafter as circumstances permit. In view of the voluminous nature of the material in the case, we have prepared and present to you suggested findings and conclusions on behalf of the defendants Atlantic, Gulf, Standard (Indiana) and Texas. Submission of proposed findings and conclusions as an aid to the court is, of course, customary procedure in connection with motions for summary judgment and

separate trials. We believe this procedure may be particularly helpful in this case in view of the length of the complaint, the bill of particulars, the stipulations, the briefs and the transcripts of argument and reargument. With this in mind we hope that attorneys for plaintiff will also submit suggested findings and conclusions on the issues covered by us".

With his letter Mr. Hodson sent to the Court the proposed Findings and Conclusions referred to therein. They were signed and submitted by counsel for the following named defendants: The Atlantic Refining Co.; Gulf Oil Corporation; Standard Oil Co. (Indiana) and The Texas Company.

Under date of October 30, 1950, the court received a letter from Mr. Neuman (of counsel for plaintiff) in which he states that "We have no desire to inflict an additional burden upon your Honor at this time, but the course of action adopted by Mr. Hodson and his co-counsel leaves us no alternative but to reply to their argument and to propose findings and conclusions in proper form".

On November 2, 1950, the court wrote a letter addressed jointly to Messrs. Hodson and Neuman. In that letter, the court stated that "While the first intimation that the court had with regard to the submission of any proposed Findings and Conclusions was that contained in Mr. Hodson's letter of October 26, and while he did not ask that any Findings or Conclusions be submitted, nevertheless, since that has now been done by Mr. Hodson (and the other counsel whose names appear at the end of the Findings and Conclusions on behalf of their respective defendants) permission is now extended, of course, to Mr. Neuman and his associate counsel to prepare and submit (at their convenience) any proposed Findings and Conclusions which they may desire to present. This also is true with respect to any of the other defendants, if any of them now wish to propose any Findings and Conclusions other than, or different from, those submitted by Mr. Hodson and associated counsel for the other defendants whom they represent".

Thereafter the court received proposed Findings and Conclusions from the following named defendants: Standard Oil Co. (New Jersey) and Shell Union Oil Corporation (January 27, 1951); The M. W. Kellogg Company (January 31, 1951); Gasoline Products Company (February 6, 1951) and on January 31, 1951, from plaintiff.

The court has here referred somewhat in detail with regard to its decision now taking the form of Findings of Fact and Conclusions of Law. As earlier indicated, this suggested procedure was initiated in the letter of Mr. A. L. Hodson, to the court dated October 26, 1950. Since it now appears to have the approval of all counsel, that is the course the court will pursue.

It is suggested by some of defendants in their proposed Findings and Conclusions that "If a private right of action under Section 4 does not accrue as long as the conspiracy continues or as long as a person injured in his business sees fit to continue in business, then the conspirators could escape suit by keeping the conspiracy in operation and the injured person could avoid statutes of limitation by continuing in business however nominal and however long after the injury".

The court is not here called upon, nor does it, decide the correctness or incorrectness of this theory. The court is deciding the instant case solely upon the facts conceded, for the purposes of this separate trial, to be true. The agreed order of Judge Knox provides "that for the purposes of such separate trial the allegations of the Complaint and of the Bill of Particulars shall be taken as true".

In the instant case it is alleged in the Complaint that one of the results of all the acts, arrangements and contracts of defendants, was the destruction of plaintiff's business. In the present case it is "a condition and not a theory" which is presented to the court.

It is this conceded (for the purposes of the separate trial) "condition" which the court here takes into consideration.

Upon a consideration of the whole of the record, the conceded facts and the

briefs and arguments of counsel, the court has arrived at the following:

### Findings of Fact

#### I.

#### General Findings.

1. On March 16, 1945, plaintiff filed its complaint in this Court seeking a recovery of threefold damages under Section 4 of the Act of Congress of October 15, 1914, commonly known as the Clayton Act, 38 Stat. 731, 15 U.S.C.A. § 15. The complaint alleged that defendants had combined and conspired to violate the Antitrust laws of the United States, and specifically it was alleged that the conspiracy was intended to and did eliminate plaintiff from competition in the business of designing and installing cracking equipment and processes in the United States.

2. A preliminary contest over venue resulted in the dismissal from the action of Universal Oil Products Company (South Dakota) and Standard Oil Company of California, D.C., 70 F.Supp. 77. A third defendant, Universal Oil Products Company (Delaware), was dismissed from the action without prejudice on April 29, 1949, following the purchase by it from plaintiff of a covenant not to sue. The remaining defendants are: Shell Union Oil Corporation; The Atlantic Refining Company; Gasoline Products Company, Inc.; Standard Oil Company (Indiana); The Texas Company; The M. W. Kellogg Company; Standard Oil Company (New Jersey); and Gulf Oil Corporation.

3. On August 18, 1948, Chief Judge Knox, upon the subjoined consent of the parties, entered an order herein which provided for a separate trial of the issues raised by the affirmative defenses of the statutes of limitations pleaded by the defendants. The purpose of the separate trial is epitomized by the direction in Judge Knox's order that it "shall be limited to the determination of the applicable period or periods of limitation available to each defendant against the cause or causes of action or parts thereof pleaded in the Complaint as particularized * * *." The material portion of the said order reads as follows: "Upon the complaint filed herein on March 16, 1945, the bill of particulars filed herein on April 19, 1948, and the answers of the respective defendants filed herein on June 17, 1948, and it appearing to the Court that the answers of the respective defendants have each raised the affirmative defenses of the statutes of limitations, and it further appearing to the Court that the attorneys for the plaintiff and for the respective defendants, with the object of promoting an early determination of this action, request and consent to a separate trial of the issues hereinafter defined presented by the affirmative defenses of the statutes of limitations, as evidenced by the sub-joined consent of said attorneys, * * *. It is therefore ordered, that the issues presented by the affirmative defenses of the statutes of limitations to the claim asserted in the particularized complaint be tried as separate issues in advance of the trial of the other issues of this action; that for the purposes of such separate trial the allegations of the Complaint and of the Bill of Particulars shall be taken as true; that the judgment of the court on the separate trial shall not determine the extent of plaintiff's recoverable damages, if any, but shall be limited to the determination of the applicable period or periods of limitation available to each defendant against the cause or causes of action or parts thereof pleaded in the Complaint, as particularized, and in the light of the facts to be adduced upon the separate trial relating to the domicile, residence, suability and general business activity of the various parties insofar as such factors or any of them may be relevant; that such judgment shall not preclude: 1. Defendants subsequently from contending that the alleged cause or causes of action or parts thereof and any alleged item or items of damage are unfounded in fact and in law except insofar as any applicable period or periods of limitations shall have been determined by such judgment; 2. Plaintiff from proving its cause or causes of action and the extent of its damages, if any, within the applicable period or periods of limitations determined

by such judgment, at such trial as may subsequently be had on the merits of this cause, * * *."

4. For the purposes of the aforesaid separate trial, stipulations of facts and presentations of issues were entered into between counsel for the plaintiff and counsel for the respective defendants. The stipulations recite that they contain all of the facts pertinent to the issues of law presented by the affirmative defenses of the statutes of limitations pleaded by each defendant.

5. In each of the stipulations it was agreed that the ultimate question upon the separate trial was: From what date or dates, if any, is a recovery by plaintiff of damages under the provisions of Section 4 of the Clayton Act, 15 U.S.C.A. § 15, against each defendant not barred by limitations?

6. Following the aforesaid statement of the ultimate question, there was set out in each of the stipulations a specification of the legal issues thought by plaintiff or the subscribing defendants to be pertinent to the decision of said question.

7. In each of the stipulations it was agreed that the claimed losses, if any, of plaintiff were suffered in the State of Kansas and that the cause or causes of action stated in the complaint as supplemented by the bill of particulars filed by plaintiff herein arose in the State of Kansas.

8. In one form or another, it was also agreed by the parties that the stipulations and facts found by the court upon the basis thereof shall not be evidence for or against the parties in any other cause or in any other proceedings in this cause "except as to the issues involved in the defenses of the statutes of limitation."

The following findings of facts are directed solely to the issues raised by the defenses under consideration and in nowise are to be construed as touching upon the merits.

## II.

### The Parties.

9. Plaintiff, The Winkler-Koch Engineering Company, is a corporation organized and existing under the laws of the State of Kansas.

10. Defendant The Atlantic Refining Company, hereinafter called Atlantic, is a corporation organized and existing under the laws of the State of Pennsylvania. On September 28, 1936, it was granted authority by the State of Kansas to engage in business in that State as a foreign corporation, and this authority has never been revoked.

11. Defendant Gulf Oil Corporation, hereinafter called Gulf, is a corporation organized and existing under the laws of the State of Pennsylvania. On February 1, 1936, it was granted authority by the State of Kansas to engage in business in that State as a foreign corporation, and this authority has never been revoked.

12. Defendant Standard Oil Company (Indiana), hereinafter called Indiana, is a corporation organized and existing under the laws of the State of Indiana. On March 19, 1903, it was granted authority by the State of Kansas to engage in business in that State as a foreign corporation, and this authority has never been revoked.

13. Defendant The Texas Company, hereinafter called Texas, is a corporation organized and existing under the laws of the State of Delaware. On March 10, 1927, it was granted authority by the State of Kansas to engage in business in that State as a foreign corporation, and this authority has never been revoked.

14. Defendant The M. W. Kellogg Company, hereinafter called Kellogg, is a corporation organized and existing under the laws of the State of Delaware. On January 16, 1920, it was granted authority by the State of New York to engage in business in that State as a foreign corporation, and this authority has never been withdrawn or revoked. Kellogg has never been granted authority by the State of Kansas to do business in that State as a foreign corporation.

15. Defendant Gasoline Products Company, Inc., hereinafter called Gasoline, is a corporation organized and existing under the laws of the State of Delaware. Since its incorporation in 1928, it has been doing

business in the State of New York but it has never been granted authority by the State of Kansas to do business in that State as a foreign corporation.

16. Defendant Standard Oil Company (New Jersey), hereinafter called Jersey, is a corporation organized and existing under the laws of the State of New Jersey. It has never been qualified to do business in the State of New York, but on the hearing it was conceded that Jersey has at all times material to the issues herein been doing business in New York. Jersey has never been granted authority by the State of Kansas to do business in that State as a foreign corporation.

17. Defendant Shell Union Oil Corporation, hereinafter called Shell, is a corporation organized and existing under the laws of the State of Delaware. On November 2, 1936, Shell was authorized by the State of New York to engage in business in that State as a foreign corporation, and this authority has never been revoked. It has never been authorized by the State of Kansas to do business in that State as a foreign corporation.

## III.

### Summary of Facts Alleged in Complaint Which for Purposes of the Separate Trial were Ordered to be Taken as True.

18. Prior to 1928 plaintiff had been engaged in designing and supervising the installation of refining equipment, particularly distillation equipment. In addition, prior to that year plaintiff had developed and perfected plans for a pipe still for cracking to make gasoline, which subsequently became known as the "Winkler-Koch" still, utilizing a process of cracking which became known as the "Winkler-Koch" cracking process.

19. The design of the Winkler-Koch still and process incorporated the best engineering principles and the improved materials, equipment, and control devices which had been gradually evolved by manufacturers of apparatus since the need for such equipment under the extreme conditions necessary for a cracking operation had arisen following the increased demand for gasoline after the year 1912.

20. Plaintiff's still and process involved no patentable departure from the prior art and was not patented by plaintiff or covered by any valid unexpired patent owned by others.

21. Plaintiff offered to engineer, construct, and install its still for refiners in consideration of payment for plaintiff's engineering services and without the requirement of continuing royalty payments. Between April, 1928, and the end of 1929 plaintiff entered into sixteen contracts with various independent refiners for the construction and installation in the United States of Winkler-Koch cracking stills, realizing an aggregate net profit therefrom of $516,535.52.

22. All of the aforesaid contracts had been obtained by plaintiff in competition with Universal Oil Products Company, hereinafter called Universal, and with defendants Gasoline, Indiana, Texas, Jersey, and Gulf, some of which were then engaged in seeking to grant patent licenses and to collect royalties for the practice of their respective cracking processes, and to design and construct, either themselves or through defendant Kellogg, the cracking equipment necessary thereto.

23. Plaintiff's still and process far excelled any still then commercially operated, and far excelled any processes then being offered to the independent refiners by the patent licensing defendants, and the successful and profitable operation of plaintiff's still opened to independent refiners the opportunity to acquire a cracking still and process utilizing the best principles of engineering without obligating themselves to pay a continuing and onerous royalty to one or more of the defendants.

24. Beginning in 1928 and during all of the times hereafter referred to, Universal, Standard Oil Company of California and the defendants combined and conspired to monopolize and restrain, and have in fact unlawfully restrained and monopolized the trade and commerce in the licensing of patented cracking processes and patented apparatus used in connection therewith,

and in the business of engineering and designing and supervising the purchase, sale, and installation of cracking processes and equipment, by various means, including (a) the creation and control of a pool of substantially all patents relating to and affecting cracking processes and apparatus therefor, (b) the elimination of competition previously existing among themselves, and (c) the use of the irresistible economic force acquired through the patent pool to restrain and eliminate competition by others.

25. One of the specific objects of the said combination and conspiracy was to eliminate the plaintiff from the business of designing and installing unpatented, royalty-free cracking equipment and processes in the United States.

26. The contracts and arrangements by which defendants created and from time to time controlled and implemented their patent pool and otherwise formed and put into effect their combination and conspiracy in restraint of trade need not here by reviewed save to note that in 1931 defendants Shell, Atlantic, Texas, Indiana, Jersey, and Gulf, together with Standard Oil Company of California, acquired various degrees of financial interest in and control of Universal.

27. The overt acts which directly affected the plaintiff may be briefly summarized as follows: (a) With the objects of destroying plaintiff's financial structure and business and of compelling all independent users of Winkler-Koch still to accept licenses from one or more of the defendants, and with the further objects of intimidating any prospective purchaser of the Winkler-Koch stills and of deterring such purchaser from dealing with plaintiff, all in order to eliminate and restrain plaintiff's business of contracting for the installation of cracking stills in competition with themselves, defendants Gasoline, Indiana, and Texas, and conspirator Universal, beginning in 1929 and continuing to 1942, instituted and prosecuted forty suits against substantially all of the several independent users of Winkler-Koch stills, alleging patent infringement by the Winkler-Koch

still and process of an aggregate of thirty-two patents, containing three hundred seventy-four separate claims of invention.

(b) Subsequent to 1931, and while patent infringement suits were being instituted and prosecuted, the conspirators, especially those engaged primarily in granting licenses, namely, Gasoline Products and Universal, through advertisements, controlled publicity, letters and notices sent to refiners, and the oral statements of agents, asserted patents in a scope not warranted by the patents and contrary to the patent laws, for the purpose of demoralizing the trade, embarrassing plaintiff, and destroying plaintiff's business. These defendants, by the same means, and for the purpose of deterring independent refiners from dealing with plaintiff, represented falsely that the patents owned or controlled by defendants and by others who have granted licensing rights to the defendants covered every form and type and detail of every cracking operation and of all cracking apparatus, and also represented truthfully that the only way in which a refiner practicing any modern or practical kind of cracking process could escape highly expensive infringement suits was by taking a license from one of the defendants.

(c) The conspirators threatened to institute infringement suits against any refiners who appeared inclined to enter into contracts with the plaintiff for the construction of a Winkler-Koch cracking still, and they endeavored to convince such refiners that the operation of the Winkler-Koch process was unsafe because it infringed a large number of patents owned by defendants or under which defendants had licensing rights, so that if a refiner installed plaintiff's unit he would be subject to a multiplicity of infringement suits.

(d) The patent infringement suits instituted against Winkler-Koch still users were brought and prosecuted by Universal, Gasoline Products, Indiana, and Texas acting in concert, pursuant to the conspiracy to eliminate plaintiff from competition, with the purpose of overwhelming the Winkler-Koch users by imposing upon each such user the necessity of choosing between

assuming the large expense of defending one or more infringement suits or of agreeing to pay royalty to one of the named defendants. The inclusion in the complaints in these suits of allegations of infringement of numerous patents upon which the respective plaintiffs did not intend to rely, and upon which they in fact did not rely, by obtaining a trial on the merits, was intended to and did serve to impose heavy additional expense upon the defendants who contested the suits.

(e) Save for the adjudication on June 26, 1935, in Root Refining Company v. Universal Oil Products Company, 3 Cir., 78 F.2d 991, which was later found to be fraudulent and corrupt, Root Refining Company v. Universal Oil Products Company, 3 Cir., 169 F.2d 514, and which was in any event overruled on the merits by the Supreme Court in Universal Oil Products Company v. Globe Oil and Refining Company, 322 U.S. 471, 64 S.Ct. 1110, 88 L.Ed. 1399, all of the patents which were relied upon by defendants in obtaining a trial upon the merits of an infringement action against a Winkler-Koch still user were either clearly invalid or not infringed by the Winkler-Koch still and process and were so adjudicated.

(f) Universal's suits against Root Refining Company, hereinafter referred to as the Root case, were among the suits designed to exert pressure upon those who had refused to take a license under the patent pool, and Universal's fraud in that case was a step taken by it in furtherance of the conspiracy among the defendants. The details of the fraud will be found in an earlier decision in this case, D.C., 79 F.Supp. 1013. The fraudulent decision remained in effect as an ostensible lawful adjudication and determination that the operation of the Winkler-Koch still constituted an infringement of Universal's patents to Dubbs, No. 1,392,629, and to Egloff, 1,537,593, throughout the lives of said patents, thereby eliminating the Winkler-Koch still as a threat to defendants' licensing structure at least until May 12, 1942, when the Egloff patent expired.

(g) Until May or June, 1944, Universal continued to assert the fraudulent Root decision either as a precedent or a binding estoppel against other Winkler-Koch still users, and by such means endeavored to compel unlicensed users of Winkler-Koch stills to enter into agreements with Universal, paying tribute to it under its patents. In or about October, 1944, after Universal's fraud in the Root case had come to light, defendants affirmatively divested themselves of all financial interest in and control of Universal.

(h) The decision of the District Court of Delaware in the Root case, 6 F.Supp. 763, was ultimately overruled by the Supreme Court in 1944 as reported at 322 U.S. 471, 64 S.Ct. 1110, 88 L.Ed 1399.

28. One of the results of all of the acts, arrangements, and contracts of the conspirators, pursuant to the conspiracy, was the destruction of plaintiff's business in contracting for and designing and installing its unpatented, royalty-free cracking equipment and process.

## IV.

### The Pleaded Theory of Damages.

29. On the theory that the damages sustained by plaintiff were the aggregate effect of the series of acts committed by the conspirators, all being aimed at a single result and all contributing to the ultimate destruction of plaintiff's business of contracting for, and designing and installing, the Winkler-Koch cracking process and unit, the complaint computes plaintiff's damages by a comparison of the profits earned in a base period before the effects of the conspiracy were apparent with the greatly reduced profits earned thereafter and up to the date of the filing of the complaint herein. The reduction in average profit for various periods of time has been determined for the entire period, and the amount thus derived is alleged to be the damage suffered by plaintiff.

30. In respect of domestic business, whereas plaintiff's average profit derived in the first twenty-month period of plaintiff's exploitation of its cracking still and process was in excess of $25,000.00 per month, or $300,000.00 per year, the aggregate net profit of plaintiff resulting from

its performance of contracts for such still and process obtained over a forty-month period ending in April, 1933, was approximately $5,000.00 per month. No such contracts were obtained by plaintiff in the period between April, 1933, and June, 1935, when the Root decision on appeal was rendered. From the latter date, when it was fraudulently adjudicated that the Winkler-Koch cracking process infringed patents owned by Universal, down to the date of the complaint, plaintiff was precluded by the cumulative effect of the conspirators' acts from entering into or obtaining any additional such contract save in four isolated instances—one in 1937, one in 1938, and two in 1940. These were obtained only by offering unreasonably low prices for plaintiff's services, and resulted in an aggregate net loss to plaintiff.

31. The average profit from plaintiff's domestic business in engineering work relating to other petroleum refining processes and apparatus, particularly distillation equipment, was in excess of $110,000.00 for each of the years 1928, 1929 and 1930, whereas since 1930 plaintiff has been able to secure only a greatly reduced volume of such business and to realize a reduced profit therefrom.

32. Except for the acts of the conspirators pursuant to their conspiracy, plaintiff would have obtained contracts for the installation of its still and process from which it would have derived profits exceeding by over $4,350,000.00 those profits which plaintiff actually realized from its greatly reduced volume of such business, and plaintiff would have obtained an amount of engineering work in refining processes and apparatus other than its cracking still and process from which it would have derived profits exceeding by over $1,300,000.00 those profits which plaintiff actually realized from its greatly reduced volume of such engineering work.

33. The total actual damages computed by plaintiff are $5,650,000.00 and judgment is sought for $16,950,000.00, together with the costs of the suit and a reasonable attorney's fee.

34. There is no inconsistency between the foregoing theory of damages and plaintiff's bill of particulars filed in this case. The latter was filed pursuant to an order entered by the Honorable Edward F. Conger requiring plaintiff to set forth (a) the names of the prospective customers claimed to have been dissuaded from doing business with plaintiff, and (b) the times when such business was solicited and refused. Plaintiff had consistently maintained that it was not claiming damages only for specific lost sales, and hence preserved in its bill of particulars, the theory of damages which had been pleaded in the complaint, by stating that the particulars were being furnished "saving and reserving unto plaintiff the right to introduce, at the trial of this cause, evidence as to recoverable damages (other than, and in addition to, damages measurable by proof of specific lost sales) sustained by plaintiff by reason of injury to its business or property resulting from any act of any defendant in furtherance of the combination and conspiracy alleged in the complaint. * * *"

## V.

### The Issues Involved.

35. The following issues are of a general nature and are common to all of the defendants:

(a) Whether the act of Congress of October 10, 1942, 56 Stat. 781, 15 U.S.C.A. § 16 note, is operative to suspend the applicable statutes of limitations as to the cause or causes of action asserted against defendants not barred as of October 10, 1942.

(b) Whether the applicable statutes of limitations of the States of Kansas or New York began to run with each of defendants' acts claimed to have been done pursuant to the alleged conspiracy and to have injured plaintiff, or began to run only if and when the alleged conspiracy shall have been terminated or consummated.

(c) Whether the facts relating to the alleged bribery and corruption of a member of the federal judiciary operate to suspend the running of any applicable statutes of limitations.

36. It has been stipulated that defendants Atlantic, Gulf, Indiana, and Texas are, and each of them is, entitled under the laws of the State of New York and of the State of Kansas to such benefits as may be afforded by the statutes of limitations of the State of Kansas. Consequently, as concerns these defendants, the only further issue which need be determined is whether the period of limitation provided by the statutes of limitations of the State of Kansas applicable to a treble damage action brought under Section 4 of the Clayton Act, 15 U.S.C.A. § 15, is one, two, or three years.

37. With respect to defendants Gasoline and Kellogg, it has been stipulated that these defendants are, and each of them is, entitled to such benefits as may be afforded by the statutes of limitations of the State of New York. It has been further stipulated that these defendants are, and each of them is, entitled under the laws of the State of New York and the State of Kansas to such benefits as may be afforded by the statute of limitations of the State of Kansas in the event this Court shall find said defendants to have been foreign corporations "authorized to do business in the state" of Kansas within the meaning of Section 309 of Chapter 60 of the Laws of Kansas, Kan.Gen.Statutes, Corrick 1935, and subject to service of process within the State of Kansas. Thus with respect to these defendants the further issues are:

(a) Whether the period of limitation provided by the statutes of limitations of the State of New York applicable to a treble damage action brought under Section 4 of the Clayton Act is three or six years.

(b) Whether the period of limitations provided by the statutes of limitations of the State of Kansas applicable to this treble damage action is one, two, or three years; and

(c) Whether either of these defendants was "authorized to do business in the state" of Kansas and subject to service of process within that State; in other words, whether the statutes of limitations of the State of Kansas were tolled as to either of these defendants by reason of absence from that state.

38. The defendants Shell and Jersey also claim that they are entitled to such benefits as may be afforded by the statutes of limitations of the State of Kansas. However, plaintiff has not stipulated with these defendants with respect to Kansas limitations as it did in the cases of Kellogg and Gasoline.

As to the defendant Jersey, it has been conceded that even though not qualified in New York, it was doing business in that State to a sufficient extent to be entitled to such benefits as may exist under the law of New York. No similar agreement was made with respect to defendant Shell; as to it, plaintiff claims that the New York statute of limitations was tolled until November 2, 1936, when Shell was qualified to do business in the state. Accordingly, the further issues as to these defendants are:

(a) Whether the period of limitation provided by the statutes of limitations of the State of New York applicable to this action is three or six years; and

(b) Whether the period of limitation provided by the statutes of limitations of the State of Kansas applicable to a treble damage action brought under Section 4 of the Clayton Act is one, two, or three years;

(c) Whether the applicable statute of limitations of the State of Kansas is tolled against these defendants by reason of absence from that state.

As to defendant Shell, a further issue is:

(d) Whether the applicable statute of limitations of the State of New York was tolled against it by reason of absence from that state until it qualified to do business there on November 2, 1936.

## VI.

### The Nature and Time of Accrual of Plaintiff's Cause of Action.

39. The facts alleged in the compaint and in the bill of particulars (which on this separate trial are to be taken as true) disclose a series of acts committed by the conspirators with a common design and for the common purpose of destroying plaintiff's business in the Winkler-Koch cracking process and unit; they were so inte-

grated and took place in such close and inextricable connection that for purposes of appraising the nature of plaintiff's claim, the complete sequence of acts and events constitutes an interdependent whole.

40. The facts alleged also establish that the individual activities of the defendants were inseparable elements of a larger program designed to accomplish that specific object of the conspiracy which was aimed at the elimination of plaintiff from competition in the cracking equipment field; the numerous and varied methods and means by which the conspirators effectuated their conspiracy to the extent to which it was directed at plaintiff cannot be segregated one from the other as separate and distinct invasions of plaintiff's interests.

41. The individual acts of the conspirators pursuant to the conspiracy may not be regarded as separate transactions or occurrences among which the total damage sustained by plaintiff may be apportioned; all of them contributed collectively to the injury complained of.

42. For example, Universal's fraud in the Root case—a step taken by a conspirator in furtherance of the conspiracy—was so interlaced with the other acts contemplated by the general scheme against plaintiff that it served not only to conceal the full extent of plaintiff's cause of action, but also effectively eliminated plaintiff's competition until expiration of the Egloff patent in 1942. There is no conceivable method of which it may be determined that during that time plaintiff's injuries and damages were attributable to specific acts other than the falsely adjudicated fact that the process infringed Universal's patents.

43. The purpose and object of the conspiracy to eliminate plaintiff from competition in the cracking equipment and process field was accomplished when plaintiff's business in contracting for the design, engineering and installation of the Winkler-Koch cracking process and unit was destroyed and plaintiff discontinued soliciting said business; this destruction resulted from the aggregate effect of all of the acts alleged. No date of destruction of plaintiff's said business is fixed at this time, but the same is left open as an issue of fact which may be determined at the general trial of this case on the merits.

44. Plaintiff had general knowledge, at or about the date of their occurrence, of the acts and circumstances of the conspirators alleged in the complaint save those relating to Universal's fraud in the Root case. On or about May 29, 1941, plaintiff for the first time acquired knowledge of certain facts which led plaintiff to believe that Universal had obtained by fraud from the Circuit Court of Appeals for the Third Circuit a favorable decision in the Root case.

## VII.

### Suability of Defendants and Tolling Considerations.

45. At all times material to the issues *sub judice,* defendant Atlantic was authorized to do business in the State of Kansas as a foreign corporation and had in that State a designated statutory agent for service of process upon it.

46. At all times material to the issues *sub judice,* defendant Gulf was authorized to do business in the State of Kansas as a foreign corporation and had in that State a designated statutory agent for service of process upon it.

47. At all times material to the issues *sub judice,* defendant Texas was authorized to do business in the State of Kansas as a foreign corporation and had in that State a designated statutory agent for service of process upon it.

48. At all times material to the issues *sub judice,* defendant Indiana was authorized to do business in the State of Kansas as a foreign corporation and had in that State a designated statutory agent for service of process upon it.

49. Although defendant Kellogg, at all times material to the issues *sub judice,* was engaged, with respect to the State of Kansas, in certain activities in interstate commerce: (a) It has never been authorized to do business in the State of Kansas as a foreign corporation; (b) Prior to 1942 it was not doing business in the State of Kansas; (c) Prior to 1942 it did not have any person in the State of Kansas through

whom valid service of process could have been had upon it; and (d) Its activities in the State of Kansas were unlawful in that it was violating the anti-monopoly laws of that State.

50. At all times material to the issues *sub judice,* Kellogg was authorized to do business in the State of New York as a foreign corporation, and had in that State a designated statutory agent for service of process upon it.

51. Although defendant Gasoline, at all times material to the issues *sub judice,* was engaged, with respect to the State of Kansas, in certain activities in interstate commerce: (a) It has never been authorized to do business in the State of Kansas as a foreign corporation; (b) Prior to 1942 it was not doing business in the State of Kansas; (c) Prior to 1942 it did not have any person in the State of Kansas through whom valid service of process could have been had upon it; and (d) Its activities in the State of Kansas were unlawful in that it was violating the anti-monopoly laws of that State.

52. At all times material to the issues *sub judice,* Gasoline was doing business in the State of New York as a foreign corporation, and had in that State officers and directors upon whom process for it could have been served.

53. Defendant Jersey has never been authorized to do business in the State of Kansas as a foreign corporation; at no time was it doing business in that State.

54. Although Jersey has never been authorized to do business in the State of New York as a foreign corporation it was, at all times material to the issues *sub judice,* actually doing business in that State and had officers and directors in the State of New York upon whom valid process for it could have been served.

55. Defendant Shell has never been authorized to do business in the State of Kansas as a foreign corporation; at no time was it doing business in that State.

56. Shell did not become authorized to do business in the State of New York as a foreign corporation until November 2, 1936. While prior to the given date it had main-tained its executive offices in the City and State of New York, and its principal officers had been present thereat, there is no showing that prior to November 2, 1936, Shell was doing business in the State of New York. Neither had Shell prior to November 2, 1936, designated any agent for the acceptance of service of process on Shell in the State of New York.

## Conclusions of Law

1. The Federal Tolling Act enacted by Congress on October 10, 1942, as amended June 30, 1945, 56 Stat. 781, c. 589, 59 Stat. 306, c. 213; see annotation following 15 U.S.C.A. § 16, is not to be restricted, and includes, and applies to, private suits pursuant to 15 U.S.C.A. § 15 for threefold damages based on violations of the federal antitrust laws, as well as to those brought by the government.

2. The aforesaid Federal Tolling Act was effective to suspend all limitations applicable to this suit as of October 10, 1942, to the time of filing the complaint herein on March 16, 1945, with the result that plaintiff's damages, if any, which were not barred on October 10, 1942, may be recovered by it.

3. The statutory basis for the case at bar being Section 4 of the Clayton Act, 15 U.S.C.A. § 15, the nature of this action, the time of its accrual, and the character of the damages sought are federal, not state, questions. These federal questions must be answered upon a consideration of the federal statute involved in the light of the principles announced by the federal courts, and are not governed or controlled by state decisional law.

4. Since there is no federal statute of limitations governing private suits brought under Section 4 of the Clayton Act, 15 U.S.C.A. § 15, the statutes of limitations of the State of New York, in which this Court is sitting, are applicable to the case at bar, including the borrowing provisions of Section 13 of the New York Civil Practice Act. Therefore, the controlling period of limitations is either that of New York or that of Kansas, where the cause of action arose, whichever is shorter, but in

borrowing the limitations laws of Kansas, there must be included the tolling provisions of the statutes of that state.

5. An action for damages under Section 4 of the Clayton Act, 15 U.S.C.A. § 15, is not one for a penalty. The damages recoverable are, under federal law, compensatory in nature. Hence:

(a) The New York period of limitations applicable to this action is that provided by Section 48(2) of the New York Civil Practice Act, namely, six (6) years for an "action to recover upon a liability created by statute, except a penalty or forfeiture."

(b) The Kansas period of limitations applicable to this action is that provided by Section 60-306(2) of the Kansas General Statutes, namely, three (3) years for "action upon a liability created by statute, other than a forfeiture or penalty."

(c) This action is not governed by the limitations of Section 49(3) of the New York Civil Practice Act (three years) or by that of Section 60-306(4) of the Kansas General Statutes (one year) or Section 60-306(3) of the Kansas General Statutes (two years).

6. The facts alleged in the complaint (which for the purpose of this separate trial are to be taken as true) establish a single wrong and constitute a single cause of action.

7. Where, as here, the suit is for the damages resulting from a single continuous wrong and from the cumulative effect of a contemplated series of acts designed to accomplish a common purpose and object, the cause of action did not accrue, and applicable limitations did not begin to run until the common purpose and object of the conspiracy had been achieved.

8. The multiple cause of action rule adopted and applied in certain antitrust cases which appears to require that applicable limitations begin to run from the time each overt act occurs or each item of injury is sustained is not applicable to the facts of the case at bar.

9. This is not a case where the conspiratorial acts were individualized overt acts which were *per se* violations of the antitrust laws. Nor is this a case where the individualized acts of the conspirators, even though not *per se* violations of the antitrust laws, were single acts on single days constituting completed torts committed against plaintiff, to each of which a definite injury and consequent damages may be attributed. Here many if not all of the acts (except of course Universal's fraud of which plaintiff was unaware) standing alone were lawful and innocent *per se* and are actionable in the tort sense only because they were bound together as parts of a single plan—the illegality of the plan making its otherwise lawful parts unlawful.

10. Under federal law when a federal cause of action involves a fraud the running of a federal statute of limitations is suspended until discovery of the fraud, despite the failure of the statute to contain such a qualifying provision. This equitable doctrine or mitigating construction is read into every federal statute of limitations.

11. Where, as here, a federal statute of limitations has not been provided in respect of private actions for damages under Section 4 of the Clayton Act, 15 U.S.C.A. § 15, and in consequence thereof this Court must adopt and apply the statutes of limitations of the States of New York and Kansas, those adopted statutes are subject to the equitable doctrine and mitigating construction set forth in conclusion No. 10. It would be incongruous to confine a federal right within the bare terms of a state statute of limitations unrelieved by the settled federal equitable doctrine as to fraud, when even a federal statute of limitations would be given the mitigating construction required by that doctrine.

12. Subject to Conclusions 6 to 9, inc., limitations did not begin to run until after May 29, 1941, when plaintiff learned for the first time of certain facts which led plaintiff to believe that the Root decision had been obtained by fraud.

13. Subject to Conclusions 6 to 12, inc., the following additional conclu-

sions are announced: (a) Defendants Atlantic, Gulf, Texas, and Indiana are, and each of them is, entitled to the three (3) year period of limitations afforded by the statutes of limitations of the State of Kansas. (b) The statute of limitations of the State of Kansas was tolled as to defendants Kellogg, Gasoline, Jersey and Shell because each of those defendants was, at all times material to the issues *sub judice,* "out of the state" of Kansas, was not "authorized to do business" in the State of Kansas as provided in Kansas General Statutes, § 60–309, and was not subject to valid service of process within that State. (c) Defendants Kellogg, Gasoline, and Jersey are, and each of them is, entitled to the six (6) year period of limitations afforded by the statutes of limitations of the State of New York. (d) The statute of limitations of the State of New York was tolled as to defendant Shell until November 2, 1936, because prior thereto it was "out of the state" of New York, was not doing business in that State, and was not subject to valid service of process; the six (6) year period of limitations afforded by the statute of limitations of the State of New York did not start to run in favor of Shell until November 2, 1936.

14. The ultimate question posed in finding of Fact No. 5, is answered as follows:

■ Giving effect only to the Federal Tolling Act, plaintiff is not barred by limitations as against any defendant from recovery of all damages which were not barred on the effective date of that Act, i. e., October 10, 1942.

■ Considering also only the applicable Kansas three-year period of limitations, plaintiff is not barred, as against Atlantic, Gulf, Indiana, and Texas, from recovery of damages from October 10, 1939. Considering also only the applicable New York six-year period of limitations, plaintiff is not barred, as against Gasoline, Jersey, and Kellogg, from recovery of damages from October 10, 1936, and as against Shell from any date whatsoever.

■ Considering also the single nature of plaintiff's cause of action, and giving effect to the federal rule of construction of statutes of limitations in cases involving fraud, plaintiff is not barred from recovery of damages against any defendant from any date. This is so regardless of the date on which plaintiff's business in contracting for and designing and installing cracking process equipment was destroyed, inasmuch as neither three nor six years elapsed between the date of the notice of the fraud, not earlier than May 29, 1941, and the effective date of the Federal Tolling Act, i. e., October 10, 1942.

Counsel may prepare and submit on proper notice an order in accordance herewith.